### In re the MONY GROUP INC. SHAREHOLDER LITIGATION.

#### C.A. No. 20554.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 17, 2004.
Decided Feb. 17, 2004.

---

22. Emphasis added.

See also 853 A.2d 661, 2004 WL 769817 (Del.Super.2004).

Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE; Steven G. Schulman, Seth D. Rigrodsky, Ralph N. Sianni, Milberg Weiss Bershad Hynes & Lerach, L.L.P., Wilmington, DE and New York City; U. Seth Ottensoser, Bernstein Liebhard & Lifshitz, L.L.P., New York City; Emily C. Komlossy, Lynda Grant, Goodkind Labaton Rudoff & Sucharow, L.L.P., New York City; Stephen T. Rodd, James S. Notis, Evan J. Kaufman, Abbey Gardy, L.L.P., New York City, for the Plaintiffs.

R. Franklin Balotti, Allen M. Terrell, Jr., J. Travis Laster, Thad J. Bracegirdle, David A. Felice, Richards, Layton & Finger, P.A., Wilmington, DE; Harvey Kurzweil, Richard W. Reinthaler, James P. Smith, III, John E. Schreiber, Dewey Ballantine, L.L.P., New York City, for the MONY Defendants.

David C. McBride, Adam W. Poff, Young Conaway Stargatt & Taylor, L.L.P., Wilmington, DE; John H. Hall, Jeffrey I. Lang, Erik Bierbauer, Debevois & Plimpton, L.L.P., New York City, for Defendants AXA Financial, Inc. and AIMA Acquisition Co.

## OPINION

LAMB, Vice Chancellor.

### I.

The plaintiffs request a preliminary injunction against a stockholder vote on a stock-for-cash merger between two companies engaged in the insurance industry. The plaintiffs allege that the defendant board, having decided to put the company

up for sale, did not fulfill its duty to seek the best transaction reasonably available to the stockholders. Specifically, the plaintiffs allege the board members failed in meeting their fiduciary duties by deciding to forego a pre-agreement auction in favor of a process involving single-bidder negotiation followed by a post-agreement market check. Moreover, the plaintiffs challenge both the board's decision, following negotiation, that the resulting merger proposal was the best proposal reasonably available, and the adequacy of the market check utilized.

The plaintiffs also challenge the adequacy of disclosures made in a proxy statement sent out to stockholders of the selling company in anticipation of the stockholder vote. The plaintiffs argue that, for a number of reasons, certain parts of that proxy statement are either incomplete or misleading.

After careful consideration of the exhibits and depositions submitted to the court, as well as the parties' briefs and arguments made before the court, the court grants a limited injunction, relating solely to proxy statement disclosures concerning payments under certain change-in-control agreements. The court holds that the harm, if any, caused by requiring a supplemental disclosure is far outweighed by the benefits associated with a fully and fairly informed stockholder vote.

## II.

### A. *The Parties*

Defendant MONY Group Inc. ("MONY" or the "Company") is a publicly traded Delaware corporation whose business is selling life insurance to high-income individuals. MONY relies on the "career agent system" to sell its insurance, as opposed to a centralized, advertising-based model. The career agent system employs salespersons in offices throughout the country who actively solicit business for MONY.

Defendants Tom. H. Barrett, David L. Call, G. Robert Durham, Robert Holland, Jr., James L. Johnson, Robert R. Kiley, Jane C. Pfeiffer, Thomas C. Theobald, Frederick W. Kanner, David M. Thomas and Margaret M. Foran (the "Outside Directors") are outside directors of MONY. Defendants Michael I. Roth, Samuel J. Foti and Kenneth M. Levine (the "Inside Directors," together with the Outside Directors, the "Board") are inside directors. Roth is Chairman and CEO, Foti is President and Chief Operating Officer, and Levine is Executive Vice President and Chief Investment Officer.

Defendant AXA is a Delaware corporation also engaged in selling insurance. It is a wholly owned subsidiary of AXA, S.A., a French corporation whose shares trade on the Paris Bourse. AXA's insurance products business is conducted principally by its wholly owned subsidiary, The Equitable Life Assurance Society of the United States. Like MONY, AXA uses the career agent system. AIMA Acquisition Co. ("AIMA") is a wholly owned Delaware subsidiary of AXA created to affect the proposed merger with MONY.

Plaintiffs E.M. Capital, Inc., Elm Realty, Inc., Congregate Investors, Ltd., Abbott Hill Partners, L.P., Alan Martin, Amanda Kahn–Kirby, The Jewish Foundation for Education of Women, Edward Cantor, and Jerome Muskal (the "Stockholders," or the "plaintiffs") have continuously owned MONY common stock during the time period at issue. The Stockholders seek to act as class representatives for all holders of MONY common stock besides the defendants and their affiliates.

### B. *MONY's Problems And Merger Talks*

The complaint suggests that MONY is a company with significant problems. The

Company posted losses in 2001 and 2002, and in October 2002 had its financial strength ratings downgraded by the four major ratings firms. Though the Stockholders assert these problems were due to mismanagement, there is substantial testimony in the record indicating that the problems actually stemmed from the Company's demutualization in 1998, general weakness in equity markets, and the costs associated with its career agent system. According to Durham, MONY's main problem was that it had been unable to generate a volume of business sufficient to recoup the cost of running its many local agencies.[1]

In November 2002, the Board met to discuss what to do about MONY's problems. MONY's financial advisor, Credit Suisse First Boston LLC ("CSFB"), gave a report to the Board. Among other things, CSFB's report suggested potential partners and acquirors for MONY, listing 12 companies including AXA. The Board considered and rejected the idea of publicly auctioning the Company, fearing that a failed auction would glaringly display the Company's weaknesses and provide competitors with information they could use to steal its career agents. Instead, the Board instructed Roth to quietly explore merger opportunities.

On December 4, 2002, Roth met with the CEO of AXA, Christopher Condron. Condron expressed interest in acquiring MONY. That same day, Roth reported to the Board his discussions with Condron and prior discussions that he had with other potential partners. The Board was enthusiastic about a potential deal with AXA because it was a large, stable company operating under the same business model, and thus could take full advantage of MONY's local agency network. The Board authorized solicitations of interest from AXA, but not from any other potential partner.

AXA contacted Roth in January 2003 to offer an initial transaction price of between $26 and $26.50 per MONY share. Roth negotiated with AXA over the next three months, during which time MONY and AXA entered into a confidentiality agreement that allowed AXA access to some of MONY's nonpublic information to facilitate its due diligence. Roth summarized the negotiations to the Board on March 18, 2003.

### C. Change In Control Agreements And AXA's Initial Bid

MONY's senior management hold Change In Control agreements ("CICs") as part of their compensation packages. The CICs are golden parachute provisions that are triggered if MONY is acquired. During negotiations, Roth estimated to AXA that these CICs were worth $120 million.

On March 31, 2003, AXA proposed to acquire MONY for $28.50 per share. Sometime in April, however, AXA determined that the CICs were actually worth about $163 million. Accordingly, on April 16, 2003, AXA lowered its offer to $26.50 per share. Around that time, Roth also met with the CEO of another insurance company, New York Life, to discuss a possible transaction, but nothing came of that.

On May 5, 2003, Roth updated the Board on his negotiations with AXA. CSFB also offered a financial analysis of a transaction at $26.50 a share. Neither Roth nor CSFB reported on soliciting oth-

---

1. Durham Dep., at 24–25. Depositions submitted to the court and cited herein will be referred to as *Name* Dep.

er potential offers, and CSFB affirmatively stated that it had not sought alternative bids. The Board met again on May 13 and authorized Roth to negotiate a definitive merger agreement with AXA. At that time, the Board first received estimates of the cost of the CICs.

During these negotiations, AXA informed MONY that it would only agree to a form of stock-for-stock merger using American Depository Receipts ("ADRs") at a fixed exchange ratio.[2] The Board met again on May 21 to discuss an ADR-for-stock merger. AXA's proposal was 1.92 AXA ADRs for each MONY share, subject to a real dollar cap of $37 and a real dollar floor of $17 (the "Original Offer"). Uncomfortable with that wide range and the corresponding lack of clarity about the value stockholders would receive, the Board rejected the offer.

The record also suggests that the Board thought that the CICs were too large and that AXA's offered price would have been higher if not for the CICs. The Board resolved not to approve any transaction until it could amend the CICs. Although the Stockholders argue that the CICs were the principal reason the Board rejected the merger proposal, the record testimony uniformly describes this reason for the Board's decision as secondary.

D. *The Board Amends The CICs*

In June 2003, the Board engaged the compensation consulting firm Frederic W. Cook & Co. ("Cook") to analyze the CICs (the "Cook Analysis"). On June 25, 2003, Cook reported to the Board that CICs typically amount to 1% to 3% of a proposed transaction, and sometimes up to 5%. Cook reported that MONY's CICs were worth about $205 million, or 15.4% of the proposed merger with AXA. Cook presented information as to how the MONY CICs compared to those in similar transactions in the form of charts. The Board reviewed these charts on a number of occasions during the course of the summer of 2003.

In July 2003, the Board informed senior management that it would not renew the CICs when they expired on December 31, 2003. The Board offered management new CICs that lowered the payout provisions to 5%—7% of the AXA transaction's value. The Board presented the new CICs as a "take-it-or-leave-it" offer, and all management parties signed on. The total value of the CICs to all management parties if the merger consummates is approximately $79 million, of which the three Inside Directors will receive about $47 million.

In late summer, MONY received notice that the major ratings houses were again going to downgrade its credit rating. Roth was able to convince the ratings agencies to delay that event until after September 2003. Roth told those agencies that MONY was likely to have completed a strategic partnership agreement by then that would resolve its difficulties. The ratings agencies placed MONY on a "downgrade watch," but agreed to postpone a downgrade until after September.

E. *AXA's Current Bid*

Condron contacted Roth in late August to ask if MONY would be interested in a cash transaction. The Board had forbidden Roth to engage in sale negotiations

---

2. ADRs are a mechanism for sponsoring dollar-denominated trading in foreign securities. A bank holds a number of foreign shares in custody overseas and assigns ADRs to represent interests in those shares. The ADRs can then be traded on American markets like traditional stock. ADRs can carry more risk, however, in that they are subject to fluctuations between the dollar and the currency of the foreign market, in this case the euro.

until the CICs were amended, so the talks were postponed until after Labor Day. Condron then made an offer of $29.50 cash per MONY share. Roth informed Condron that the CICs had been modified and that he thought AXA's offer should be $1.50 higher to reflect the change. Condron initially offered an additional $1.20 per share, but Roth stuck to the $31 asking price and also negotiated a provision allowing MONY to pay a dividend worth about 25¢ per share before any transaction consummated.

On September 17, 2003, MONY and AXA announced that they had signed a merger agreement (the "Agreement") providing for the payment of $31 cash for each share of MONY. This price represents a 7.3% premium to MONY's then-current trading price of $28.89. The merger values MONY's equity at $1.5 billion; the total transaction including liabilities is worth approximately $2.1 billion. MONY also accepted a broad "window-shop" provision and a "fiduciary out" termination clause. The latter allows the Board to respond to a superior offer if MONY pays AXA a $50 million termination fee, which is about 3.3% of the equity value of the deal and 2.4% of the transaction value.

In the five months since the merger was announced, no one has made a competing proposal. The only other interest expressed in MONY came in a letter from the CEO of Lincoln Financial Group in October 2003 (the "2003 Letter") indicating an interest in talking with MONY *if* the AXA deal failed. The 2003 Letter attached an October 2001 letter from Lincoln (the "2001 Letter") that contained an expression of interest in exploring an acquisition of MONY. The 2001 Letter said:

"If the two of us were willing to sign a confidentiality agreement that would permit mutual due diligence we could find the way to agree to a price that would be fair and appropriate for MONY stockholders. I would expect the premium to the existing price [then trading at $29.87] to be quite large." [3]

On January 16, 2004, MONY filed a final proxy statement (the "Proxy Statement") that includes, *inter alia,* a description of the background of the transaction, the fairness analysis from CSFB, and the Board's recommendation to stockholders to approve the merger. A stockholder vote is scheduled for February 24, 2004.

### F. The Claims

The Stockholders make three claims in their bid to stop the merger. First, they claim that the Board breached its fiduciary duties under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[4] by failing to procure the best possible price for MONY, presumably through a public auction. Second, they claim that the Board violated its disclosure duties in the Proxy Statement. Third, they claim that AXA and AIMA aided and abetted these breaches.

For the reasons expressed below, the *Revlon* claim lacks merit, as do most of the disclosure claims, and the aiding and abetting claim. The Stockholders have succeeded, however, in showing a probability of success on their claim that MONY's disclosure regarding the CICs is materially misleading. This disclosure violation threatens irreparable harm because stockholders may vote "yes" on a transaction they otherwise would have voted "no" on if they had access to full or nonmisleading disclosures regarding the CICs. That harm

---

3. Transmittal Aff. of Seth D. Rigrodsky in Supp. of Pls.' Mot. for a *Prelim. Inj.* ("Rigrodsky Aff."), Ex. 24.

4. 506 A.2d 173 (Del.1986).

outweighs the harm that MONY will suffer as a result of the need to circulate corrective disclosures. A limited injunction order will therefore be granted.

## III.

■ The standard for a preliminary injunction is well established. The moving party "must establish that there is a reasonable probability of success on the merits, that irreparable harm will result if an injunction is not granted, and that the balance of equities favors the issuance of the injunction."[5] Moreover, "in the absence of a competing offer a plaintiff must make a particularly strong showing on the merits to obtain a preliminary injunction because an injunction in such circumstances risks significant injury to shareholders."[6]

## IV.

■ The Stockholders claim that the Board is in breach of its fiduciary duties to stockholders because it failed to maximize stockholder value. "The consequences of a sale of control impose special obligations on the directors of a corporation. In particular, they have the obligation of acting reasonably to seek the transaction offering the best value reasonably available to the stockholders."[7] As made clear in *Revlon,* this mandate requires a board to get the best short-term price for stockholders in a sale of control.[8] This requirement, however, "does not demand that every change in

the control of a Delaware corporation be preceded by a heated bidding contest."[9] Rather, the basic teaching of *Revlon* and its progeny is that "the directors must act in accordance with their fundamental duties of care and loyalty."[10]

Specifically, the Delaware Supreme Court has held that a board can fulfill its duty to obtain the best transaction reasonably available by entering into a merger agreement with a single bidder, establishing a "floor" for the transaction, and then testing the transaction with a post-agreement market check.[11] Here, the plaintiffs challenge the Board's determination to forego an active auction process for a post-agreement market check, the Board's determination that the AXA offer presented the best short-term deal for stockholders, and the adequacy of any market check in the life insurance industry.

■ In determining whether the Board met its duty to obtain the best transaction reasonably available to the stockholders, the traditional inquiry of whether the Board was adequately informed and acted in good faith is heightened. In a change-of-control transaction, the directors have the burden of proving that they were adequately informed and acted *reasonably.* The court will scrutinize "the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision [and] . . . the reasonableness of the directors' action in light of

---

5. *In re Aquila, Inc. S'holders Litig.,* 805 A.2d 184, 189 (Del.Ch.2002).

6. *Id.*

7. *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 43 (Del.1994) (footnote omitted).

8. *Revlon* 506 A.2d at 182.

9. *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (Del.1989).

10. *Id.*

11. *Id.* at 1287; *see also In re Pennaco Energy, Inc. S'holders Litig.,* 787 A.2d 691, 705–06 (Del.Ch.2001); *Kohls v. Duthie,* 765 A.2d 1274, 1282 n. 9 (Del.Ch.2000); *Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.,* 729 A.2d 280, 292–93 (Del.Ch.1998).

the circumstances then existing."[12] However, the court must review the decision-making process in light of the complexity of the directors' task in a sale of control. As the Delaware Supreme Court stated in *Paramount Communications, Inc. v. QVC Network, Inc.*,

> [t]here are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a **reasonable** decision, not a **perfect** decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination.[13]

The plaintiffs first argue that because the Board relied upon Roth to determine and explore alternatives it breached its fiduciary duties. Specifically, the plaintiffs allege that "[t]he Board's exclusive reliance on Roth was particularly inappropriate in view of the fact that Roth and other members of MONY's senior management stood to gain excessive payments under the CIC Agreements if MONY was sold."[14] The Stockholders argue that the Board should have established a special committee to continue negotiations with AXA.

▬▬ This "lone wolf" theory, as described at oral argument, cannot stand up against the record, and fails as a matter of law. A board appropriately can rely on its CEO to conduct negotiations, and the involvement of an investment banker is not required.[15] Here, it was the Board, not Roth, that decided back in November 2002 that it needed to "find a home for [the] company."[16] The Board actively supervised Roth's negotiations. And during this pursuit, Roth acted diligently in securing improvements for MONY.[17] Further, the Board repeatedly demonstrated its independence and control, first in rejecting the proposed ADR-for-stock transaction and second in reducing the insiders' CICs. Moreover, that the CICs would improperly influence Roth is doubtful. As discussed, it was the Board that made the decision to find the Company a home. Once that decision is made, the CICs, acquiror neutral, would not tilt the balance in favor of one bidder over another. For all these reasons, the independent Board's reliance on Roth to conduct negotiations was reasonable and well founded.

▬▬▬ The plaintiffs next argue that the decision to forego an auction and utilize a market check was in error. Specifically, the plaintiffs point to a decision by the Board not to solicit interest from several potential acquirors, contrary to the suggestion of CSFB. The Board, however, acted in a reasonable manner in making its

---

12. *Paramount Communications, Inc.*, 637 A.2d at 45.

13. *Id.*

14. Pl.'s Opening Br. in Support of their Mot. for a Prelim. Inj. ("Opening Br."), at 39.

15. *See In re Pennaco*, 787 A.2d at 706–07.

16. *See* Durham Dep., at 218–19.

17. *See* Stoddard Dep., at 147 (reporting on management's attempt to seek more money, and stating, "[t]he results of the negotiations were what ultimately ended up being a higher exchange ratio than the 1.8 indicated previously"); Condron Dep., at 32 (recalling an April 22 meeting where "Michael Roth was pushing for a higher price"); Roth Dept., at 207–09 (discussing negotiations with Henri de Castries, chairman of AXA's managing board).

business decision. As a preliminary matter, "the mere fact that [a] board decided to focus on negotiating a favorable price with [one potential acquiror] and not to seek out other bidders is not one that alone supports a breach of fiduciary duty claim."[18] Single-bidder approaches offer the benefits of protecting against the risk that an auction will be a failed one, and avoiding a premature disclosure to the detriment of the company's then-ongoing business.

The Board took into consideration a number of factors in deciding not to pursue a public auction or active solicitation process, and not to make out-going calls to potentially interested parties after receiving AXA's cash proposal. These include a concern that an earlier attempt by Allmerica Financial to conduct a public auction in the life insurance industry resulted in no buyer emerging and very harsh consequences thereafter to that company's business and the market performance of its stock;[19] that an auction or active solicitation would jeopardize MONY's career agency force;[20] that competitors might use the process to obtain due diligence from MONY and gain access to MONY's career agents;[21] and the knowledge of the possibility of a post-agreement market check.[22] Given the nature of MONY's business, specifically its career agency force, the Board's judgment was reasonable that the risks of a pre-agreement auction, as opposed to a post-agreement market check, outweighed the benefits.

The Stockholders also argue that after utilizing the nonpublic, single-bidder process, the Board did not reasonably conclude that the Agreement would result in the best transaction reasonably available. Specifically, they argue that the Board had only the slightest knowledge of Roth's negotiations with AXA. Further, they argue that although the Board retained CSFB, it did not ask CSFB why an adjusted base case was being used, or why it was fair that AXA pay a premium below that paid in other "precedent transactions." The plaintiffs go on to note "no director ever questioned CSFB or asked them to perform an analysis as to the relationship between MONY's purportedly low ROE and the lack of premium in a transaction."[23]

Again, the record shows the Board acted reasonably in making its determination.[24]

18. *In re Pennaco*, 787 A.2d at 706.

19. *See* Durham Dep., at 37, 210–11; Roth Dep., at 181, 304–05; Foti Dep., at 83. The plaintiff stockholders describe reference to Allmerica as a red herring because "by the third quarter of 2003 Allmerica had turned itself around and reported a 2003 profit of $1.63 per share compared to a $5.79 per share loss in 2002." Pls.' Reply Br. in Supp. of their Mot. for a Prelim. Inj. ("Reply Br."), at 24. The Board's decision to proceed with the merger was made *during* the third quarter of 2003, during which it did not have the benefit of this information. And, as the plaintiffs concede, "[i]n the short term, the failure of the Allmerica transaction may have looked like a debacle to shareholders." *Id.* This poor short-term result not only could have, but *should have* been considered by a company already faced with the prospect of a downgrade in credit ratings.

20. *See* Durham Dep., at 210–11; Stoddard Dep., at 224; Roth Dep., at 181, 304–05; Foti Dep., at 83.

21. *See* Stoddard Dep., at 224–25; Roth Dep., at 133, 305.

22. *See* Durham Dep., at 210–11; Foti Dep., at 83.

23. Reply Br., at 26.

24. Although in their reply brief, the plaintiffs state, "[i]n fact, as recently as October 2003 another bidder, which MONY has refused to talk to, has surfaced," the plaintiffs conceded at oral argument that they were not basing a

The Board, whose members are financially sophisticated and knowledgeable about the insurance and financial services industry, relied on its knowledge of the industry and of potential strategic partners available to MONY.[25] Since the Company's demutualization in 1998, Roth briefed the Board regularly on MONY's strategic alternatives and industry developments, and the Board was advised of alternatives to the Merger.[26] This financially sophisticated Board engaged CSFB for advice in maximizing stockholder value. It obtained a fairness opinion from CSFB,[27] itself incentivized to obtain the best available price due to a fee that was set at 1% of transaction value;[28] and CSFB was not aware of any other entity that had an interest in acquiring MONY at a higher price.[29] Using these resources and the considerable body of information available to it, the Board determined that because MONY and AXA share a similar business model, the career agency distribution system, and have complementary products, AXA was a "perfect fit," for MONY, and thus presented an offer that was the best price reasonably available to stockholders.

At the root of a judicial inquiry into whether a board met its *Revlon* duties is whether the board acted *reasonably*. In describing a board's actions in a *Revlon* inquiry, Vice Chancellor Strine wrote, "While one would not commend the ... board's actions as a business school model of value maximization, the process the directors used to sell the company cannot be characterized as unreasonable."[30] Similarly here, the Board might have asked more questions of CSFB; it might have required more frequent reports of Roth.

*Revlon* claim on this. Specifically, they have not argued that the 2003 Letter constituted an alternative superior proposal, so that MONY could exercise its fiduciary out under the window shop provision of the Agreement.

25. *Cf. In re Pennaco,* 787 A.2d at 706 ("As important, the ... board's knowledge of the company has not been seriously challenged. The board is comprised of members with relevant expertise and experience in the ... business.... There is no basis to believe that the board itself did not have a sound basis to evaluate the price at which a sale of the company would be advantageous.").

26. *See* Durham Dep., at 209; Roth Dep., at 39; 86; Stoddard Dep., at 174; Foti Dep., at 42–43, 55, 59–60; *see also* Rigrodsky Aff., Ex. 12, at MONY 05726 (Minutes of the Board Meeting on May 13, 2003) ("Mr. Roth then again proceeded to discuss the potential alternatives to the transaction under discussion. In this regard, he once again reviewed the history of other alternative transactions which had been considered by management dating from the 1990 timeframe to the present.").

27. *See McMillan v. Intercargo Corp.,* 768 A.2d 492, 505 n. 55 (Del.Ch.2000) ("The board's reliance upon an investment banker (whose independence and qualifications are not challenged in the complaint) is another factor weighing against the plaintiffs' ability to state an actionable claim that the defendant directors breached their fiduciary duties by failing to secure the highest value reasonably attainable.").

28. *Accord In re Vitalink Communications Corp. S'holders Litig.,* 1991 WL 238816, at *10 (Del.Ch. Nov. 8, 1991), *aff'd sub nom, Grimes v. John P. McCarthy Profit Sharing Plan,* 610 A.2d 725 (Del.1992) (TABLE) (highlighting a fee agreement as an incentive to seek the best available price); *In re Formica Corp. S'holders Litig.,* 1989 WL 25812, at *11 (Del.Ch. Mar. 22, 1989) (viewing an investment banker's substantial holdings in a selling company as providing "additional procedural protections").

29. Stoddard Dep., at 243. And while CSFB did not participate directly in the negotiations, this was due to a reasonable concern that CSFB's involvement could cause AXA to get its own investment banker, which MONY believed would "increase the risk of leaks and might result in a more extensive due diligence process" to its detriment. *Id.,* at 242.

30. *In re Pennaco,* 787 A.2d at 705.

But the record certainly supports a conclusion that the Board acted reasonably, especially given Board knowledge that there would be a substantial opportunity for an effective market check after the Agreement was announced.

■ Finally, the Stockholders challenge the adequacy of that post-agreement market check.[31] They argue that hostile bids in the insurance industry are rare and, therefore, that any "market check" mechanism is suspect. This argument presupposes that a bid during the market check would be hostile, which is simply not true. The Stockholders confuse a friendly alternative transaction proposal with a hostile bid; the two are not the same. The Stockholders further argue that due to the complexity of the insurance industry and MONY, as well as of the CICs, other potential bidders would have to perform extensive due diligence which could not be done in time. Market checks brought before this court typically last between one and two months.[32] In *In re Ft. Howard Corp. Stockholders Litigation*,[33] this court upheld a six-week market check as a proper alternative to an active auction. Surely, the five-month period since September 17, 2003, is adequate time for a competing

---

31. The market check, as structured in the Agreement, is quite open and broad. A "window-shop" provision in the Agreement prohibits MONY from "solicit[ing], initiat[ing] or knowingly encourage[ing], or tak[ing] any other action to in any way knowingly facilitate, any inquiries or the making of any proposal that constitutes or could reasonably be expected to lead to an Alternative Transaction Proposal." Rigrodsky Aff. Ex. 2, at A-30. There is a very broad out attached to this prohibition:

> Notwithstanding the foregoing, at any time prior to obtaining the Company Stockholder Approval, in response to a bonafide written Alternative Transaction Proposal that the board of directors of the Company determines in good faith by resolution duly adopted, after consultation with outside legal counsel and a financial advisor of nationally recognized reputation, constitutes or is reasonably likely to constitute a Superior Proposal, and which Alternative Transaction Proposal was unsolicited and made after [September 17, 2003] ... the Company may, subject to compliance with Section 7.4(c) [a notice provision], and after giving AFI written notice of such action, (x) furnish information with respect to the Company and the Company Subsidiaries to the Person making such [a proposal] pursuant to an executed confidentiality agreement containing terms and provisions at least as restrictive as those contained in the Confidentiality Agreement, provided that all such information has previously been provided to AFI or is provided to AFI prior to or substantially concurrently with the time it is provided to such Person, and (y) participate in discussions or negotiations with the Person making [the proposal] regarding [the proposal].

*Id.* at A-30. Alternative Transaction Proposals are defined to include "any inquiry, proposal or offer from any Person relating to, or that could reasonably be expected to lead to" a business combination with MONY. *Id.* at A-42. To be considered a Superior Proposal, the Alternative Transaction Proposal must be a bona fide written proposal for at least 50% of the voting power of the common stock or 50% of the consolidated assets of MONY that is not dependent on financing not then committed, and that the Board, in good faith, determines would (A) result in a transaction that, if consummated, is more financially favorable to holders of Common Stock than the Merger; and (B) is reasonably capable of being completed on the terms proposed. *See id.* at A-44. A termination fee of $50,000,000 is provided for.

Thus, while MONY could not actively solicit offers during the market check period, it could, subject to a reasonable termination fee, pursue inquiries that could reasonably be expected to lead to a business combination more favorable to stockholders than the Agreement and are reasonably capable of being completed on the terms proposed.

32. *See, e.g., Kohls*, 765 A.2d at 1282 n. 9 (30 days); *In re Formica*, 1989 WL 25812, at *12 (30 business days).

33. 1988 Del. Ch. Lexis 110, at *37-46 (Del. Ch. Aug. 8, 1988).

bidder to emerge and complete its due diligence, notwithstanding the complexities of the business involved. Further, to the extent that New York Insurance Law Section 7312(v) would prohibit an alternate bidder from acquiring more than 5% of the outstanding common stock of MONY without the prior approval of the New York Superintendent of Insurance for a period of five years after MONY's demutualization,[34] that period ended in December, long before either the AXA proposal or any competing transaction could close.

The Stockholders further argue that the added costs to a competing bidder from the termination fee and CICs prevent an adequate market check. The termination fee is well within the range of reasonableness; here representing only 3.3% of MONY's total equity value, and only 2.4% of the total transaction value.[35] And the CICs are bidder neutral; they would affect any potential bidder in the same fashion at they affected AXA. Finally, to the extent the Agreement led to an unsettled market reaction, this would not lead to a dampening of bidder interest, but an increase.

For all the foregoing reasons, in the circumstances presented by the Agreement, the court finds a five-month market check more than adequate to determine if the price offered by AXA was the best price reasonably available. At least on the preliminary record, the evidence supports a conclusion that the Board acted reasonably in determining its course of action and has met its *Revlon* duties.

## V.

■■■ The Stockholders claim that the proxy materials were materially false and/or misleading in several respects. Directors of Delaware corporations, in order to fulfill their fiduciary duties to stockholders when seeking stockholder action, must disclose fully and fairly all material information within the board's control.[36] In *Rosenblatt v. Getty Oil Co.*, the Delaware Supreme Court adopted the United States Supreme Court's test for materiality:

> An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote.... [This standard] does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[37]

This objective standard is augmented by the rule that while directors do not have to provide information that is simply " 'helpful,' " once they take it upon themselves to disclose information, that information must

---

**34.** *See* N.Y. Ins. Law § 7312(v) (McKinney 2004).

**35.** *See Kysor Indus. Corp. v. Margaux, Inc.,* 674 A.2d 889, 897 (Del.Super.1996) ("Commentators have expressed the view that liquidated damage provisions in the one-to-five percent range of the proposed acquisition price are within a reasonable range....").

**36.** *Stroud v. Grace,* 606 A.2d 75, 84 (Del. 1992).

**37.** 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)) (emphasis added).

not be misleading.[38] In other words, although "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information," once a company "travel[s] down the road of partial disclosure of the history leading up to the Merger ..., [it has] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[39] Finally, and important in this case, *In re Pure Resources, Inc. Shareholders Litigation* establishes that stockholders of Delaware corporations "are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."[40]

With this standard in mind, the court addresses the plaintiffs' disclosure claims. The plaintiffs' claim regarding disclosure of a comparative analysis of CICs in comparable transactions is discussed first; followed by a discussion of the proxy claims which do not have a reasonable probability of success on the merits.

## A. *Misrepresentations Regarding The CICs*

The plaintiffs argue that the Proxy Statement is misleading because it fails to disclose the percentage of transaction value of aggregate payments to be made under the amended CICs as compared to payments in similar transactions. The Cook Analysis included in the Company's minutes from the Board's July 1, 2003 meeting shows that the mean CIC payment as a percentage of deals for selected financial services industry transactions is 3.37%.[41] The 25th and 75th percentile for such transactions is .94% and 4.92%, respectively. The base case under the original CICs for MONY would have been 15.39% of the Original Offer. The amended CICs lowered that number to 6.37%, still well above the 75th percentile.[42]

■ At oral argument, counsel on both sides spent considerable time discussing whether the Board considered this analysis in deciding whether or not to approve the Agreement. Whether it did or not, notwithstanding the *Pure Resources* standard for disclosure of analysis relied upon by a board, the fact that the payments under the CICs were above the 75th percentile in this analysis is material under the *Rosenblatt* standard for materiality, and thus is required to be disclosed as material information within the Board's control as dictated by *Stroud v. Grace.*[43]

The history of AXA's bidding shows that there is essentially a 1:1 ratio between the value of the CICs and the amount per share an acquiror offers. The Cook Anal-

38. *In re Staples, Inc. S'holders Litig.,* 792 A.2d 934, 954 (Del.Ch.2001).

39. *Arnold v. Soc'y for Sav. Bankcorp.,* 650 A.2d 1270, 1280 (Del.1994).

40. 808 A.2d 421, 449 (Del.Ch.2002)

41. Rigrodsky Aff. Ex. 18, at MONY 05994 (Minutes of the Board Meeting on June 25, 2003).

42. AXA argues that the 6.48% is the *maximum* percentage of the amounts that can be paid pursuant to the amended CICs, and the amounts set forth in the comparative analysis are the percentage of amounts *actually* paid in comparable transactions. *See* Cook Aff., at 291–92. The court does not agree that as a result, this comparison can be described as "apples-to-oranges." Def. AXA's Answering Br. in Opp'n to Pls.' Mot. for a Prelim. Inj. ("AXA Br."), at 40. Further, while Durham testified that the numbers may shrink, he guessed that they would shrink to about 4.5%, still above the 75th percentile. Durham Dep., at 155.

43. 606 A.2d 75 at 84.

ysis, then, shows that as a percentage of deal value, the money that will be paid to beneficiaries of the CICs is above the amount paid in CICs in more than 75% of comparable transactions. The court is persuaded that, in the circumstances presented, the Proxy Statement needs to include disclosure of information available to the Board about the size of the CICs as compared to comparable transactions.[44] The materiality of such disclosure is heightened by the Board's rejection of the Original Offer for reasons relating, at least in part, to the outsized CICs. Given that history, the stockholders are entitled to know that the CICs remain unusually large, when faced with the decision whether to vote to approve the $31 per share merger price, vote "no," or demand appraisal. Putting it differently, the record supports the conclusion that there is a substantial likelihood that disclosure of the information described in footnote 44 " 'would [be] viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' "[45]

Moreover, disclosure of comparative information is made necessary by the extensive disclosure in the Proxy Statement about steps the Board took to *lower* the payments under the CICs. This disclosure creates the strong impression that the amended CICs are in line with those in comparable transactions. Specifically, the Proxy Statement informs:

> Together with their independent advisors, the independent directors developed a proposal for amended CIC agreements that would substantially reduce the cost of these agreements. The independent directors concluded, with the assistance of their advisors, *that the amended CIC agreements would be more consistent with current market practices than the then existing control transactions.*
>
> . . . .
>
> The amended CIC agreements made a number of changes to the prior CIC agreements, as a result of which the potential payments to the executives in the aggregate were reduced by slightly more than one-half of the potential payments under the prior CIC agreements. . . . The aggregate amount of the potential payments to the individuals under the amended CIC agreements, based on certain assumptions, was estimated by the advisors to the independent members of the board of directors

44. As recently as September 9, 2003, the Compensation Committee reviewed comparative information about CICs in comparable transactions. *See* Ex. A to MONY Def.'s Feb. 17, 2004 Letter to the Hon. Stephen P. Lamb, at MONY 07183. That information, together with information presented to the Board at its September 17, 2003 meeting, *see* Rigrodsky Aff., Ex. 21, at MONY 07357, should give stockholders meaningful information about the relationships between the CICs and the $31 per share merger price.

45. *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Defendants cite *Roberts v. Gen. Instrument Corp.*, 1990 WL 118356 at *10 (Del.Ch. Aug. 13, 1990) for the proposition that the Cook Analysis cannot be material because the Stockholders are not voting on the CICs but rather on the Agreement. In *Roberts*, the court held that, because the plaintiffs were tendering their shares, information material to future alternative management scenarios including changes to a corporation's capital structure or operating plans were not material to the stockholders' determination to tender their shares. Essentially, *Roberts* decided the information the plaintiffs sought was too remote to the vote. Here, there is a 1:1 ratio between the CICs and the value the Stockholders will receive for their stock, and the Cook Analysis shows payments made under the MONY-authorized CICs remain strikingly out of proportion to comparable transactions. The facts here are thus inapposite to those in *Roberts*.

in July 2003 to be approximately $79 million on a pre-tax basis when compared to the prior CIC agreements. .

. . . .

... Mr. Roth stated to [Mr. Condron] that he believed AXA Financial should increase the price to be paid to MONY's stockholders in the potential transaction by the potential reduction in payments to the executives under the amended CIC agreements that was in excess of the potential cost savings under the prior CIC agreements that had been preliminarily agreed to in May with AXA Financial.

. . . .

... In considering the proposed adjustments, the MONY board of directors reviewed and discussed the substantial cost savings to MONY that resulted from the executives' decision to enter into the amended CIC agreements in replacement of the then-existing CIC agreements, and the resulting enhancement of stockholder value in the merger. . . . [46]

Thus, even if the Board was under no separate duty to disclose the comparative analysis, it has, by what it did elect to include in the Proxy Statement, "traveled down the road of partial disclosure of the history leading up to the Merger," and thus has "an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." [47] By so heavily emphasizing the *reduction* in payments under the CICs and the *direct correlation* between that reduction and the price per share Roth was able to negotiate, without mentioning the comparative analysis, the Proxy Statement misleadingly implies that the payments un-

der the CICs are consistent with current market practices. Of course, they are considerably more lucrative than is normal.

Disclosure of this information would not be a form of "self-flagellation" Delaware courts have rejected. "Self-flagellation," as that term is described in *Stroud,* involves the drawing of "legal conclusions implicating [the board] in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter." [48] If anything, facts presented in both briefs, as well as those in the Proxy Statement, seem to point toward acceptable board behavior in the approval of the CICs. Rather than simply requiring the Board to engage in "self-flagellation," disclosure here would serve the important purpose of providing information likely to alter the total mix of information available to MONY stockholders.

## B. *Comparative Companies And Transaction Analysis*

The Stockholders next complain that the Proxy Statement did not disclose the alternative groupings of companies that CSFB used for comparison in the appendix of its report to the Board, and that it did not reveal that 18 of the 71 similar transactions analyzed by CSFB lacked sufficient data to provide a proper comparison. This, the Stockholders claim, amounts to withholding information upon which the Board relied in making its recommendation.

 The only authority the Stockholders cite for this stretch is *Pure Resources,* which does not support their position. *Pure Resources* requires a "fair summary"

---

46. Rigrodsky Aff., Ex. 2, at 25–28 (emphasis added).

47. *Arnold,* 650 A.2d at 1280.

48. 606 A.2d at 84 n. 1.

of information in proxy statements.[49] It does not require the Board to include CSFB's entire report exactly as it saw it when it made its decision to recommend the Agreement.[50] The plain meaning of "summary" belies the Stockholders' interpretation. Nothing in the record indicates that the Board actually relied on the alternative comparisons in the appendix, or, by extension, that the summary actually presented in the Proxy Statement was unfair.[51]

■ It is also immaterial, as a matter of law, that CSFB could not obtain next–12–month earnings on 25% of similar transactions over the last 8 years. The Stockholders do not explain what weight that fact could have to the Board or the Stockholders, nor do they suggest that 53 similar transactions was an insufficient number for CSFB to analyze.[52] The only change the Stockholders seem to want is from "CSFB analyzed 71 transactions" to "CSFB analyzed 71 transactions, but decided that relevant information was available for only 53 of them." This triviality could not reasonably be expected to affect the total mix of information.

## C. *MONY's Book Value*

The Stockholders' complaint about CSFB's methodologies fails for similar reasons. In order to show the Board how an *acquiring* company would view MONY, CSFB valued the Company utilizing a technique under the purchase method of accounting. This analysis included certain hypothetical adjustments to MONY's balance sheet that resulted in an increase in MONY's expected earnings, but a decrease in its book value. Because CSFB's "adjusted" case resulted in a lower book value, the Proxy Statement contains certain disclosures comparing the $31 deal price to this adjusted book value, as well as to the unadjusted book value, Since the "adjusted" ratios make the $31 price per share look better, the Stockholders argue that their disclosure is misleading.

■ Neither use of the purchase accounting method in this analysis, not mere disagreement with a financial advisor's chosen methodology creates a disclosure claim.[53] The Stockholders have not suggested that MONY was for some reason barred from presenting CSFB's analysis, an analysis recognized under GAAP, rather than their preferred book value analysis. The nature of the CSFB exercise is fully disclosed, and the Proxy Statement presentation of that information does not appear to be misleading.

The Stockholders also complain that the Proxy Statement does not disclose whether CSFB applied a purchase accounting adjustment to the 13 compared companies, and thus may present a flawed and misleading "apples-to-oranges" comparison. This claim fails because the Proxy Statement contains an express disclaimer on that subject, warning that "[t]he tables

---

49. 808 A.2d at 449.

50. *See In re Vitalink*, 1991 WL 238816, at *14 ("[I]t is necessary to draw a line somewhere or else disclosures will become so voluminous that they no longer serve their purpose.").

51. The only piece of the record the Stockholders cite indicates that the Board relied not on the appendix material, but on CSFB's opinion, the crux of which was the 13–company comparison in the body of the presentation.

Opening Br. at 24, *citing* Roth Dep., at 292–309.

52. Even if they did, a complaint about the accuracy or methodology of a financial advisor's report is not a disclosure claim. *Cf. In re JCC Holding Co., Inc. S'holders Litig.*, 843 A.2d 713, 2003 WL 22246591 at *6 (Del.Ch. Sept. 25, 2003).

53. *Id.*

alone do not constitute a complete description of the financial analyses. Considering the tables below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view." [54] Combined with a detailed explanation of the purchase accounting adjustment on the same page of the Proxy Statement,[55] this disclaimer sufficiently warns the Stockholders of any "apples-to-oranges" problem such that, in the total mix, it cannot be considered misleading.[56]

### D. *Disclosure of the 2003 And 2001 Letters*

■ The plaintiffs challenge the adequacy of the Proxy Statement's disclosure regarding the 2003 and 2001 Letters. The Proxy Statement discloses the history of MONY's receipt of, and the content of, these letters as follows:

On October 3, 2003, the Chief Executive Officer of MONY received a personal letter from the Chief Executive Officer of a third party who, in 2001, had expressed an interest in a possible business combination with MONY. The letter conveyed best wishes for success in closing the merger with AXA Financial

and expressed confidence that the transaction would be consummated. The letter went on to indicate that in the unlikely event that the transaction did not close, MONY should not hesitate to contact the third party." [57]

The plaintiffs argue that both the 2003 and 2001 Letters constituted firm offers, and are *ispo facto* material. Alternatively, they argue that even if those letters did not constitute firm offers, the partial disclosure offered by the Proxy Statement is misleading and makes the full disclosure of those letters material.

■ As the Delaware Supreme Court stated in *Bershad v. Curtiss–Wright Corp.*, "[e]fforts by public corporations to arrange mergers are immaterial under the *Rosenblatt v. Getty* standard, as a matter of law, until the firms have agreed on the price and structure of the transaction." [58] The 2003 Letter did not provide a price or structure; it was not a definitive offer. It simply expressed an interest in discussing the *possibility* of a combination *if* the AXA deal fell through; indeed, it did so at the same time as expressing a confidence that the AXA deal *would* go through. The 2003 Letter thus is not, by itself, material under *Bershad.*[59]

---

54. Rigrodsky Aff., Ex. 2, at 34.

55. *Id.*

56. This court considered and rejected a similar "apples-to-oranges" problem in *In re Wheelabrator Tech's Inc. S'holders Litig.,* 1990 WL 131351 at *5–6 (Del.Ch. Sept. 6, 1990). There stockholders claimed, *inter alia,* that a proxy statement's similar transaction analysis was materially misleading because it did not disclose that one transaction was privately negotiated in Canada and that one of the compared companies had a side business. The court found it crucial that "[t]he advisors did not opine that the [two] transactions were identical or comparable to the instant merger in every respect, as [the] plaintiffs' argument implicitly assume[d]." *Id.* at *6. Similarly,

not only does the Proxy Statement not claim that its similar transactions analysis considered only identical transactions and companies, but instead expressly states that it has adjusted MONY's numbers to make it more comparable to other companies and transactions, and comparison without considering that adjustment will lead to a skewed result.

57. Rigrodsky Aff. Ex. 2, at 31.

58. 535 A.2d 840, 847 (Del.1987).

59. The plaintiffs point to a letter from Roth stating that the Company's outside counsel believed the letter "arguably constitutes an 'Alternative Transaction Proposal.'" Rigrodsky Aff. Ex. 24. Alternative Transaction Pro-

The 2001 Letter, attached to the 2003 Letter, also did not provide a price or structure. The mere suggestion in the 2001 Letter than any price would include a large premium over the existing price is mere speculation and is not, as the Stockholders argue, a "price virtually identical to AXA."[60] The 2001 Letter was preliminary in nature, only suggesting that a price *could* be found *if* the contingencies of a signed confidentiality agreement and due diligence were completed. Again, by itself, the 2001 Letter is immaterial under *Bershad.*

■ Finally, the court must consider whether the disclosures in the Proxy Statement regarding these matters are partial and misleading.[61] As discussed, a proxy statement disclosing the history leading to the transaction must contain an "accurate, full, and fair characterization of those historic events."[62] In *Arnold v. Society for Savings Bankcorp. Inc.*, the Delaware Supreme Court found a partial disclosure in a proxy statement to be misleading. In *Arnold,* a subsidiary of a company had been the subject of a highly contingent bid for $275 million in the context of a prior, failed auction. The company, with its subsidiaries, ultimately merged in a transaction valued at only $200 million. The proxy statement sent out in connection with the merger did not disclose the $275 million figure of the earlier bid. The Supreme Court concluded that given partial disclosures regarding

the history of the board's process, a reasonable stockholder might conclude that "there only was an 'evaluation,' an 'investigation,' 'certain potential indications of interest,' and that there were no 'genuine' bids for actual dollar amounts in an 'auction.'"[63] Without deciding whether or not the contingent bid by itself would be material, the Supreme Court ruled that the partial disclosures were misleading, especially given that the later merger transaction was valued at 37% less than the bid for the subsidiary.

*Arnold* involved nondisclosure of genuine offers for a subsidiary above the value of the actual transaction, coupled with misleading statements implying the board only received potential indications of interest. The 2003 and 2001 Letters are in no way comparable to the contingent offer in *Arnold.* Thus, the Proxy Statement is not misleading as a result of its nondetailed description of those letters. For the foregoing reasons, the Proxy Statement discloses all material information in connection with communications from Lincoln Financial Group in an adequate fashion under Delaware fiduciary duty law.

E. *Statements Regarding The Sale Process*

■ The Stockholders' next claim is that the Proxy Statement misleadingly implied that MONY shopped itself by disclosing that Roth had conversations with po-

---

posals under the Agreement, however, are defined to include *inquiries,* as well as proposals or offers. The letter from Roth does not specify on what basis outside counsel believed the 2003 Letter *arguably* constituted such a proposal; by the clear language of the letter, it is hard to construe it as even so much as an *inquiry.* It certainly is not a "Superior Proposal" within the meaning of Section 7.4(a) of the Agreement.

60. Opening Br. at 28.

61. Cf. *Arnold,* 650 A.2d 1270 at 1277 ("Assuming hypothetically that there had been no partial disclosures as set forth and discussed below, the FAC bid may or may not have been material. We need not address that issue because of our holding that the FAC bid was material in view of the partial disclosures.").

62. *Id.* at 1280.

63. *Id.* at 1282.

tential merger partners and acquirors over the last 3 years. The Stockholders do not deny that these conversations happened, but complain that the Proxy Statement does not disclose that most of them occurred before MONY began to negotiate seriously with AXA.

Without belaboring the point, I cannot find that a reasonable stockholder would interpret "we had conversations from time to time as opportunities arose" as meaning "we actively shopped the Company." That interpretation piles inference upon inference relatively far afield from the disclosed facts, which are themselves truthful.[64]

## F. *Rejection Of The Original Offer*

■ The plaintiffs take issue with the discussion in the Proxy Statement of the Original Offer. The plaintiffs' brief notes: "The Proxy Statement states that the MONY Board 'was not willing to accept AXA Financial's current offer principally due to concerns regarding the potential volatility of AXA's American Depository Receipts.'"[65] The plaintiffs take this statement out of context. Read fully, the Proxy Statement discloses that "[l]ater that evening, Mr. Roth *informed Mr. Condron* that the MONY board of directors was continuing to consider MONY's strategic alternatives, but was not willing to accept AXA Financial's current offer principally due to concerns regarding the potential volatility of AXA's American Depository Receipts."[66] The plaintiffs do not present any record to the court challenging that this is what Roth conveyed to Condron, and one can conceive of many

reasons for conveying this information, as opposed to concerns over the CICs, to a potential acquiror. Further, the following sentence in the Proxy Statement, "[a]s a result, on May 21, 2003, MONY and AXA Financial ceased negotiations regarding the proposed transaction," merely conveys that, as a result of the conversation between Roth and Condron, negotiations ceased.

Moreover, the proceeding paragraph in the Proxy Statement does not misleadingly describe the May 21, 2003 Board meeting. While the bulk of the paragraph discusses Board concern over a transaction involving ADRs, it concludes with the statement, "[t]he MONY board of directors also *extensively discussed* the CIC agreements, including the potential payments to the executives in the event of a transaction with AXA Financial followed by termination of their employment under the circumstances described in the CIC agreements."[67] The plaintiffs mistakenly concentrate on the length of the passage without looking to the words themselves. The Proxy Statement, read in full, makes clear the centrality of the CICs to the Board's overall concern. The Proxy Statement reports on a July 3, 2003 Board meeting: "The MONY board of directors ... directed that MONY and its advisors cease all discussions with any third parties relating to the sale of MONY or any other transaction that would result in a change in control of MONY under the agreements until such time as the existing agreements expired or the amended CIC agreements were entered into."[68] Based upon the

---

64. *See Emerald Partners v. Berlin,* 2003 WL 21003437, at .*27 (Del.Ch. Apr. 28, 2003), *aff'd,* 2003 WL 23019210 (Del. Dec. 23, 2003) (finding that courts should not presume that a reasonable stockholder would draw unreasonable conclusions from disclosed facts).

65. Opening Br. at 32.

66. Rigrodsky Aff. Ex. 2, at 24 (emphasis added).

67. *Id.* (emphasis added).

68. *Id.* at 25–26.

record, the court cannot conclude that the Proxy Statement contains materially misleading disclosures about the conversation between Roth and Condron regarding the rejection of the Original Offer, the May 13, 2003 Board meeting, or the centrality of the CICs to Board decision making.

### G. *Misrepresentation Of Reasons For Increase In MONY Value*

■ The Proxy Statement discloses that the Board believed that MONY's stock price around September 17, 2003 was inflated by speculation about a possible acquisition and that the $31 offer was fair given the result of that speculation.[69] The Stockholders do not challenge the truth of the disclosure, and it is difficult to see how they could considering it only states the *subjective* belief of the Board at the time. Instead they lamely complain that this statement of belief conditioned stockholders to think that MONY would not eventually recover from its recent troubles and should be immediately sold.

■ This claim is without merit. The disclosure at issue states that the Board came to its belief about speculative inflation based on the advice it received from CSFB. It is hardly misleadingly for the Board to disclose that it relied on its financial advisor to determine the underlying value of its shares, and that speculation was one factor that the advisor considered. The Proxy Statement does not say that all of the price increase was due to speculation or that the Board was providing an objective analysis of the price increase; it only states the Board's belief that there was some speculation-based increase. This would not have altered the total mix of information for a reasonable stockholder.[70]

### VI.

■ Delaware courts "recognize the irreversible harm which would occur by permitting a stockholder vote on a merger to proceed without all material information necessary to make an informed decision."[71] Indeed, "the irreversible nature of a stockholder vote on a merger supports the argument that any possible harm caused by a tainted voting process would be irreparable."[72] The misleading CIC disclosure in this case would likely cause some stockholders to accept the proposed cash-out when they otherwise would not.

■ Here, an injunction would remedy the wrong caused to the Stockholders' right to cast a vote after a full and fair disclosure of material facts. Because the

---

69. *Id.* at 29–30 ("The belief of the MONY Board of directors, based on discussions with MONY's management and MONY's financial advisors and publicly available research analysts' reports, that the market price of MONY common stock in the months immediately preceding the September 17, 2003 public announcement of the proposed merger was inflated by the speculation concerning a possible acquisition of MONY and the premium that AXA Financial's offer of $31 per share represented after taking into account this likely inflation.").

70. The court notes in passing that the Stockholders would have required the Board to account for alternative reasons for the price increase, such as investor optimism regarding a general recovery in equity markets. Not only is a board not required to engage in such speculation (which in any case is not mandated in a subjective statement of belief), it is likely forbidden from doing so. *See Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 145 (Del.1997) ("Speculation is not an appropriate subject for a proxy disclosure.").

71. *State of Wis. Inv. Bd. v. Bartlett,* 2000 WL 238026 at *10 (Del.Ch. Feb. 24, 2000).

72. *In re IXC Communications, Inc. v. Cincinnati Bell, Inc.,* 1999 WL 1009174 at *10 (Del. Ch. Oct. 27, 1999).

necessary supplemental disclosure can be accomplished quickly, there is no basis to believe that an injunction will result in any harm to MONY or the defendants. In particular, there is no suggestion that the necessity of a short delay in the stockholders meeting poses any threat to the merger proposal, which is not expected to close for several months in any case. Thus, the balance of hardships tilts decidedly in favor of the entry of an injunction.

## VII.

For the foregoing reasons, and to the limited extent already described, the plaintiffs' motion for preliminary injunction is granted. The parties shall submit an order in conformity with this opinion.