# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IRA TRUST FBO BOBBIE AHMED, on behalf of similarly situated Class A stockholders of NRG YIELD, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CONSOLIDATED C.A. No. 12742-CB |
| DAVID CRANE, JOHN F. CHLEBOWSKI, MAURICIO GUTIERREZ, KIRKLAND B. ANDREWS, BRIAN R. FORD, FERRELL P. MCCLEAN, CHRISTOPHER S. SOTOS and NRG ENERGY, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

Date Submitted: September 22, 2017
Date Decided: December 11, 2017

Peter B. Andrews, Craig J. Springer & David M. Sborz of ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeremy S. Friedman, Spencer Oster & David Tejtel of FRIEDMAN OSTER & TEJTEL PLLC, New York, New York; Jason M. Leviton & Joel Fleming of BLOCK & LEVITON LLP, Boston, Massachusetts; *Counsel for Plaintiff*.

William M. Lafferty & D. McKinley Measley of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants John F. Chlebowski, Brian R. Ford, and Ferrell P. McClean*.

Brian C. Ralston, Andrew H. Sauder & Mathew A. Golden of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendants David Crane, Mauricio Gutierrez, Kirkland B. Andrews, Christopher S. Sotos, and NRG Energy, Inc.*

**BOUCHARD, C.**

This action arises out of a reclassification of the shares of NRG Yield, Inc. ("Yield" or the "Company") that went into effect in May 2015. Yield's business model is to own a portfolio of income-producing energy generation and infrastructure assets from which dividends can be distributed to public stockholders—a model often referred to as a "yieldco." Since its formation in 2012, Yield has been controlled by NRG Energy, Inc. ("NRG"), which manages Yield's day-to-day affairs and is responsible for identifying and placing assets into Yield.

After its initial public offering in 2013, Yield had two classes of stock, both of which were entitled to one vote per share. NRG then held approximately 65% of Yield's voting power through its ownership of all of Yield's Class B shares, and public stockholders held approximately 45% of Yield's voting power through their ownership of Class A shares. The prospectus for the Class A shares stated that NRG intended to maintain its controlling interest in Yield.

By 2015, NRG's voting control of Yield had been diluted to approximately 55% as a result of Class A shares being issued to acquire assets to transfer to Yield. Concerned that its voting control of Yield was in jeopardy if Yield continued to fund asset acquisitions with Class A shares, NRG proposed that Yield undertake a recapitalization where Class A stockholders would be issued one share of a new class of non-voting common stock for each Class A share they held. NRG intended for Yield to use the non-voting common stock as currency to acquire assets in the future.

NRG's proposal was conditioned from the beginning on the receipt of the approval of a majority of the outstanding shares of Yield not affiliated with NRG, meaning a majority of Yield's outstanding Class A shares. Upon receipt of the proposal, Yield's board delegated to its standing Conflicts Committee the authority to evaluate and negotiate the proposal. The independence of the three members of the Conflicts Committee is not challenged.

Through negotiations with the Conflicts Committee, NRG's proposal was revised so that newly-created Class C and Class D shares would be issued on a one-for-one basis to Class A and Class B stockholders, respectively, *i.e.*, stockholders would receive one Class C share for every Class A share and one Class D share for every Class B share. The Class C and Class D shares would have the right to 1/100 of one vote per share instead of being non-voting, as initially proposed. NRG also agreed to amend a contract, under which Yield had a right of first offer on certain NRG assets, to include some additional assets. As finally negotiated, the proposal is referred to herein as the "Reclassification." In May 2015, the Reclassification received the necessary stockholder approvals and went into effect that same month.

In September 2016, a Class A stockholder filed this action asserting that the members of the Yield board breached their fiduciary duties in connection with their approval of the Reclassification, and that NRG breached its fiduciary duty as a

2

controlling stockholder by causing Yield to undertake the Reclassification. Defendants moved to dismiss the complaint for failure to state a claim for relief.

Resolution of this motion implicates three questions: (1) Is the Reclassification a conflicted transaction subject to entire fairness review even though it nominally involved a *pro rata* distribution of shares? (2) If so, should the analytical framework articulated in *Kahn v. M&F Worldwide, Corp.*,[1] a squeeze-out merger case, apply to the Reclassification? (3) If so, has that framework been satisfied in this case from the face of the pleadings? For the reasons explained below, I conclude that the answer to each of these questions is yes, and thus the Complaint must be dismissed for failure to state a claim for relief.

## I.    BACKGROUND

Unless noted otherwise, the facts in this decision are drawn from the Verified Class Action Complaint (the "Complaint") and documents incorporated therein,[2] which include documents produced to plaintiff in response to a books and record

---

[1] 88 A.3d 635 (Del. 2014).

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citations omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

3

demand made under 8 *Del. C.* § 220.[3] Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

## A. The Parties and Relevant Non-Parties

Plaintiff IRA Trust FBO Bobbie Ahmed alleges it was a Class A stockholder of Yield at all relevant times.

Defendant NRG is a power company that produces, sells, and delivers energy, energy products, and energy services in the United States. NRG is headquartered in both West Windsor Township, New Jersey, and Houston, Texas. Non-party Yield, a Delaware corporation, owns a portfolio of energy generation and infrastructure assets in the United States. As a result of the Reclassification, Yield now has four classes of common stock. The Company's Class A and C shares are listed on the New York Stock Exchange. The Company's Class B and D shares are held by NRG and not publicly traded.

When it approved the Reclassification, Yield's board (the "Board") was comprised of the seven individual defendants: David Crane, John F. Chlebowksi, Mauricio Gutierrez, Kirkland B. Andrews, Brian R. Ford, Ferrell P. McClean, and Christopher S. Sotos. Four of the directors (Crane, Andrews, Gutierrez, and Sotos) were members of Yield's management at the time, and each of them held executive

---

[3] In connection with its Section 220 demand, plaintiff agreed that documents produced by Yield "shall be deemed incorporated by reference into the operative version of the complaint." Defs.' Opening Br. 12 n.4.

4

positions with NRG at various times.[4]  The other three directors (Chlebowksi, Ford, and McClean) were not members of Yield's management and served on the Conflicts Committee (defined below) that evaluated and approved the Reclassification.[5]  Their independence is not challenged.

### B.    The Yield Business Model

On December 20, 2012, NRG incorporated Yield as a dividend growth-oriented company to serve as the primary vehicle through which NRG would own, operate, and acquire energy generation and infrastructure assets.[6]  Under a Management Services Agreement, NRG or its affiliates provide services to Yield, including carrying out all day-to-day management, accounting, banking, treasury, administrative, liaison, representative, regulatory, and reporting functions and obligations.  The Management Services Agreement also allows NRG to make recommendations with respect to the payment of dividends and the exercise of any voting rights to which Yield is entitled with respect to its subsidiaries.  For the fiscal year ended December 31, 2015, NRG received approximately $8 million in management fees and reimbursement for expenses under the Management Services Agreement.

---

[4] Compl. ¶¶ 12, 14, 16, 18.

[5] Compl. ¶¶ 13, 15, 17.  Chlebowski is Yield's Lead Independent Director and previously served as a director of NRG from December 2003 until July 2013.  Compl. ¶ 13.

[6] Compl. ¶ 21; Transmittal Aff. of Glenn R. McGillivray ("McGillivray Aff.") Ex. C at 1.

5

On July 22, 2013, Yield closed an initial public offering of 22,511,250 shares of Class A stock. NRG retained 42,738,750 shares of Class B stock, which were never offered to the public. Both classes of stock entitle their holders to one vote per share on all matters. NRG's Class B shares represented about 65% of Yield's total voting power at the completion of its initial public offering.

In connection with its IPO, Yield established a standing Corporate Governance, Conflicts and Nominating Committee (the "Conflicts Committee") to review and approve proposed conflicted transactions between Yield and NRG.[7] The Conflict Committee's charter requires that "its members satisfy the requirements for independence under applicable law and regulations of the SEC and NYSE standards for directors and nominating committee members."[8]

The prospectus for the IPO disclosed to prospective investors in Class A shares that "***NRG will be our controlling stockholder and will exercise substantial influence over Yield and we are highly dependent on NRG***."[9] The prospectus further explained NRG's intention to maintain its controlling interest and the consequences of that control:

> NRG has also expressed its intention to maintain a controlling interest in us. As a result of this ownership, NRG will continue to have a substantial influence on our affairs and its voting power will constitute

---

[7] McGillivray Aff. Ex. A at 22.

[8] *Id.*

[9] McGillivray Aff. Ex. C at 43 (emphasis in original).

6

a large percentage of any quorum of our stockholders voting on any matter requiring the approval of our stockholders. Such matters include the election of directors, the adoption of amendments to our amended and restated certificate of incorporation and bylaws and approval of mergers or sale of all or substantially all of our assets. This concentration of ownership may also have the effect of delaying or preventing a change in control of our company or discouraging others from making tender offers for our shares, which could prevent stockholders from receiving a premium for their shares. In addition, NRG will have the right to appoint all of our directors. NRG may cause corporate actions to be taken even if their interests conflict with the interests of our other stockholders (including holders of our Class A common stock).[10]

From its inception, NRG always has appointed Yield's senior executives, and Yield has depended on NRG as a source for its income-producing assets. To facilitate these related-party transactions, NRG granted Yield and its affiliates a contractual right of first offer (the "ROFO Agreement") on any proposed sale of certain enumerated NRG assets. Yield distributes to stockholders the profits generated by its acquisitions through cash dividends. As explained in the prospectus for the Class A offering, Yield's "ability to grow through acquisitions depends, in part, on NRG's ability to identify and present us with acquisition opportunities."[11]

To finance acquisitions, Yield frequently needs to raise new capital. Issuing equity or convertible notes dilutes all of the Company's common stockholders, but NRG suffers a unique detriment in that each new issuance also reduces its controlling

---

[10] *Id.* at 43-44.

[11] *Id.* at 44.

stake in Yield. A dual-class voting structure was allegedly not implemented at the time of the IPO because NRG did not anticipate Yield's pace of acquisitions and rapid growth.[12] Between the July 2013 IPO and the fall of 2014, NRG's voting power fell from approximately 65% to approximately 55% due to equity issuances.[13]

## C.    NRG and Yield Seek to Preserve NRG's Control Over Yield

On October 8, 2014, NRG management presented to the Board several alternatives that would allow Yield to continue raising capital for acquisitions while preserving NRG's control. The proposed alternatives included issuing low or non-voting common stock, entering into a stockholder agreement that would allow NRG to maintain control over significant corporate events, issuing preferred stock in the Company or non-voting units in an LLC, merging Yield into a limited partnership structure, and having NRG invest 50% of the equity value in future Yield acquisitions.[14]

On December 15, 2014, David Crane, Yield's then-Chief Executive Officer, and Kirkland Andrews, Yield's Chief Financial Officer, presented their fellow Board members with a proposal to create a new Class C stock that would carry no voting rights.[15] From the outset, the proposal was conditioned on obtaining the approval of

---

[12] Compl. ¶ 44.

[13] Compl. ¶ 31.

[14] Compl. ¶¶ 33, 52.

[15] Compl. ¶ 34.

Yield's public stockholders or a "majority of the minority" of the outstanding shares of Class A stock not affiliated with NRG.[16] The slide deck that accompanied the presentation indicated that issuing non-voting stock would "[p]reserve[] NRG's voting control of [Yield] above 50%" and "[b]etter manage future potential voting dilution."[17] At the end of the meeting, the Board authorized its Conflicts Committee, composed of Chlebowski, Ford, and McClean, to evaluate and negotiate the proposed reclassification with NRG.[18] The Conflicts Committee was advised by Crowell & Moring LLP as its legal counsel, and Moelis & Company LLC ("Moelis") as its financial advisor.

On January 30, 2015, NRG presented the Conflicts Committee a proposal for Yield to issue a new class of non-voting common stock in connection with the proposed reclassification.[19] On February 6, 2015, NRG sent the Conflicts Committee a formal reclassification proposal where Class A stockholders would receive one share of a new class of non-voting common stock for each share of Class A stock held.[20]

---

[16] McGillivray Aff. Ex. H at NRGY-220_00000917; Ex. I at NRGY-220_00000276.

[17] Compl. ¶ 35; McGillivray Aff. Ex. H NRGY-220_00000918.

[18] Compl. ¶ 37; McGillivray Aff. Ex. G NRGY-220_00000900.

[19] Compl. ¶ 38.

[20] Compl. ¶ 39.

9

On February 9, 2015, after reviewing the February 6 proposal with its advisors, the Conflicts Committee rejected the proposal and made a counteroffer to NRG.[21] The counteroffer included four amendments to the February 6 proposal: (1) the addition of assets to the ROFO Agreement; (2) a special dividend or "true-up" to compensate Class C stockholders for the potential difference in the trading price of Class A and Class C shares; (3) dividend enhancements or protections for Class C stockholders; and (4) rights for Class C stockholders to convert their shares into voting shares upon the occurrence of certain events.[22]

On February 17, 2015, the Conflicts Committee received a revised proposal from NRG under which: (1) the proposed new class of stock would entitle holders to 1/100 of one vote per share, rather than no vote at all; and (2) NRG would make additional assets available to Yield for purchase under a new ROFO Agreement (the "Amended ROFO Agreement").[23] On February 19, 2015, the Conflicts Committee met with its advisors and NRG to discuss the February 17 proposal.[24]

On February 24, 2015, the Conflicts Committee met again with its advisors and NRG to discuss the February 17 proposal.[25] After NRG left the room, Moelis

---

[21] Compl. ¶ 40.

[22] Compl. ¶ 40.

[23] Compl. ¶¶ 41-42.

[24] Compl. ¶¶ 44-45.

[25] Compl. ¶¶ 44-46

made a presentation that stated, absent any reclassification, "NRG's ownership could be reduced below 50.1% as early as 2015."[26]  At the conclusion of the meeting, the Conflicts Committee approved the February 17 proposal.[27]  Under the final terms of the transaction, Yield would establish two new classes of common stock (Class C and Class D) and distribute shares of Class C and Class D stock to holders of then outstanding Class A and Class B shares, respectively, through a stock split.[28]  Yield and NRG also would enter into the Amended ROFO Agreement, making additional assets potentially available to Yield.[29]

### D.      Stockholder Approval of the Reclassification

On March 26, 2015, Yield issued a proxy statement (the "Proxy") to solicit stockholder approval of the Reclassification, which was conditioned on the approval of two separate proposals: (1) a proposal to approve the adoption of amendments to Yield's certificate of incorporation to establish new series of Class C and Class D

---

[26] Compl. ¶¶ 54-55.

[27] Compl. ¶ 46.

[28] Compl. ¶ 47.

[29] Compl. ¶ 47.  The Proxy describes these assets as those "NRG previously acquired from Edison Mission Energy, up to $250 million of equity investment in residential and distributed generation solar portfolios, and the Carlsbad and Mandalay projects . . . Based on NRG's analysis as provided to the Conflicts Committee, NRG stated its belief that the enhanced ROFO arrangement would have the effect of extending the average life of NRG ROFO Assets from 17 to 20 years."  McGillivray Aff. Ex. A at 23.

11

stock; and (2) a proposal to approve the adoption of amendments to Yield's certificate of incorporation to effectuate the stock split.[30]

The Proxy stated that the Board, upon the unanimous recommendation of the Conflicts Committee, unanimously determined to recommend the Reclassification. The Board's rationale for approving the Reclassification included the Conflicts Committee's belief that the transaction would provide a means to continue raising capital through future equity issuances as well as to maintain Yield's relationship with NRG.[31] The Proxy explained that the Reclassification could prolong the period over which NRG could exercise a controlling influence over Yield, but that the Board believed that NRG's controlling influence would provide significant benefits.[32]

At Yield's annual stockholders meeting held on May 5, 2015, over 80% of the outstanding shares of common stock (Class A and B) voted to approve both proposals concerning the Reclassification.[33] Additionally, a majority of the outstanding shares of Class A stock unaffiliated with NRG voted in favor of both

---

[30] McGillivray Aff. Ex. A at 20-21.

[31] *Id.* at 24-28.

[32] *See Id.* at 26, 28 ("We believe our relationship with NRG, including NRG's expressed intention to maintain a controlling interest in the Company, provides significant benefits, including management and operational expertise, and future growth opportunities.").

[33] Compl. ¶ 68; McGillivray Aff. Ex. P at 2.

12

proposals.[34] The Reclassification was effected on May 14, 2015. The next day the Class C shares began trading on the New York Stock Exchange.[35]

## II. PROCEDURAL HISTORY

On September 12, 2016, plaintiff filed the Complaint on behalf of a putative class of Class A stockholders, asserting two claims. Count I asserts that the members of the Board breached their fiduciary duties in connection with their approval of the Reclassification. Count II asserts that NRG breached its fiduciary duty as the controlling stockholder of Yield by causing Yield to undertake the Reclassification.

On November 4, 2016, defendants filed a motion to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. The Court heard the motion on June 20, 2017. At the Court's request, the parties submitted supplemental briefing on September 22, 2017 to address Vice Chancellor Slights's decision in *In re Martha Stewart Living Omnimedia, Inc. Stockholder Litig.*,[36] which was rendered after the oral argument.

---

[34] McGillivray Aff. Ex. P at 2.

[35] Compl. ¶ 68; McGillivray Aff. Ex. P.

[36] 2017 WL 3568089 (Del. Ch. Aug. 18, 2017).

13

## III. ANALYSIS

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[37]

The standards are minimal, but the Court "will not credit conclusory allegations or draw unreasonable inferences in favor of the Plaintiffs."[38]

The Court's consideration of this motion hinges on what standard of review governs plaintiff's claims. Plaintiff argues that the Reclassification was a conflicted transaction that is subject to entire fairness review. According to plaintiff, NRG obtained a unique benefit in the Reclassification that the minority stockholders did not enjoy because the transaction perpetuated NRG's majority stake in Yield at a time when that control was slipping away.

Defendants argue that the business judgment rule should apply for two reasons. First, defendants argue that the Reclassification was a *pro rata* transaction that affected all of Yield's stockholders equally. In other words, defendants contend

---

[37] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[38] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *5 (Del. Ch. Jan. 31, 2013) (citation omitted).

14

that NRG did not receive a unique benefit from the Reclassification so that it was not a conflicted transaction.

Second, defendants posit that even if, *arguendo*, the Reclassification was a conflicted transaction, the business judgment rule still applies because the framework set forth in *Kahn v. M&F Worldwide, Corp.* ("*MFW*") should apply to the Reclassification, and plaintiff has failed to plead sufficient non-conclusory facts that any of the elements of that framework was not satisfied.[39]

I address each of these arguments in turn.

## A. Plaintiff Has Pled Sufficient Facts to Warrant Review of the Reclassification as a Conflicted Controller Transaction

One of the most fundamental principles of Delaware corporate law is that directors are presumed to have acted "independently, with due care, in good faith and in the honest belief that [their] actions were in the stockholders' best interests."[40] Because of this presumption, controlling stockholders are not automatically subject to entire fairness review when a controlled corporation effectuates a transaction. Rather, the "controller also must engage in a conflicted transaction" for entire fairness to apply.[41]

---

[39] 88 A.3d at 645.

[40] *Williams v. Geier*, 671 A.2d 1368, 1376 (Del. 1996) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[41] *In re Crimson Expl. Inc. Stockholder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014).

Conflicted transactions come in many forms. In *In re Crimson Expl. Inc. Stockholder Litig.*, the Court identified two categories of conflicted transactions involving controlling stockholders that have triggered entire fairness review in the context of a merger or acquisition: "transactions where the controller stands on both sides," such as a parent-subsidiary merger, and "transactions where the controller competes with the common stockholders for consideration" in a sale of the corporation to a third party.[42] The Court also identified three examples within the second category: (1) where the controller receives greater monetary consideration for its shares than the minority stockholders;[43] (2) where the controller takes a different form of consideration than the minority stockholders;[44] and (3) where the controller gets a "unique benefit" by extracting "something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders."[45]

---

[42] *Id.* at *12.

[43] *See, e.g.*, *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *12 n.57 (Del. Ch. Mar. 6, 2012) (merger where a substantial premium was paid for controller-owned high-vote stock).

[44] *See, e.g., In re John Q. Hammons Hotels Inc. S'holders Litig.*, 2009 WL 3165613, at *7-8, 12 (Del. Ch. Oct. 2, 2009) (controller received, among other consideration, a continuing equity stake in the surviving entity, and the minority stockholders received cash); *In re NLR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 (Del. Ch. 2005) (controller rolled over part of transaction proceeds into equity stake in surviving corporation).

[45] *Crimson*, 2014 WL 5449419, at *13-14 (citing *In re Primedia, Inc. S'holder Litig.*, 67 A.3d 455, 462-67, 472-76, 482 (Del. Ch. 2013)).

More recently, in *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, Vice Chancellor Laster comprehensively reviewed Delaware case law and identified numerous types of transactions involving controlling stockholders outside the context of a merger or acquisition that have triggered entire fairness review.[46] He explained that, in all of these transactions, the controller extracted "a non-ratable benefit" that warranted heightened scrutiny.[47] Examples of "non-ratable benefit" transactions he identified include: (1) security issuances, purchases, and repurchases;[48] (2) asset leases and acquisitions;[49] (3) compensation arrangements, consulting agreements, and service agreements;[50] (4) settlements of derivative

---

[46] 2016 WL 301245, at *11-15 (Del. Ch. Jan. 25, 2016).

[47] *Id*. at *12.

[48] *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008) (Strine, V.C.); *Flight Options Int'l, Inc. v. Flight Options, LLC*, 2005 WL 5756537 (Del. Ch. July 11, 2005); *Strassburger v. Earley*, 752 A.2d 557 (Del. Ch. 2000); *In re Dairy Mart Convenience Stores, Inc.*, 1999 WL 350473 (Del. Ch. May 24, 1999); *Harbor Fin. Partners v. Sugarman*, 1997 WL 162175 (Del. Ch. Apr. 3, 1997); *Kahn v. Tremont Corp.*, 1996 WL 145452 (Del. Ch. Mar. 21, 1996) (Allen, C.), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[49] *Summa Corp. v. Trans World Airline, Inc.*, 540 A.2d 403 (Del. 1988); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654 (Del. Ch. July 26, 2010) (Strine, V.C.).

[50] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014); *Dweck v. Nasser*, 2012 WL 161590 (Del. Ch. Jan. 18, 2012); *Monroe Cty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890 (Del. Ch. June 7, 2010); *Carlson v. Hallinan*, 925 A.2d 506 (Del. Ch. 2006); *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536 (Del. Ch. 2000).

actions;[51] and (5) recapitalizations.[52]   Applying its "non-ratable benefit" rationale, the Court held that a derivative challenge to three advisory agreements between EZCORP and an entity affiliated with its controlling stockholder was governed by the entire fairness standard.[53]

Turning to this case, plaintiff argues that the entire fairness standard applies because NRG received a uniquely valuable or "non-ratable" benefit in connection with the Reclassification that was not shared with the Company's other stockholders, namely the ability to perpetuate its majority control over Yield.[54]   In this vein, the Complaint alleges that, "[b]y the fall of 2014, it became clear to NRG that it would lose majority control over Yield as early as 2015," and thus NRG "hatched" the Reclassification "to solve this problem."[55]

---

[51] *In re MAXXAM, Inc.*, 659 A.2d 760 (Del. Ch. 1995).

[52] *Levco Alt. Fund Ltd. v. Readers' Digest Ass'n, Inc.*, 803 A.2d 428 (Del. 2002) (TABLE).

[53] *EZCORP*, 2016 WL 30125, at *15.

[54] That control of a corporation has value is well-accepted.  A controlling stockholder reaps a number of benefits from its position, including the ability to determine the outcome of director elections, to control the business operations of the corporation, and to seek a premium for its control block of shares.  *See, e.g., In re Books-A-Million, Inc. Stockholders Litig.*, 2016 WL 5874974, at *14 (Del. Ch. Oct. 10, 2016) *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE) ("The law has acknowledged . . . the legitimacy of the acceptance by controlling shareholders of a control premium."); Ronald J. Gilson & Jeffery N. Gordon, *Controlling Controlling Shareholders*, 152 U. PA. L. REV. 785, 786 (2005) ("[A] controlling shareholder may extract private benefits of control in one of three ways: by taking a disproportionate amount of the corporation's ongoing earnings, by freezing out the minority, or by selling control.").

[55] Compl. ¶ 3.

In an effort to avoid the presumptive application of entire fairness review, defendants make essentially three arguments as to why NRG did not obtain a unique benefit in connection with the Reclassification. I find none of them convincing, at least at this stage of the case where I must accept plaintiff's allegations as true and draw all reasonable inferences in its favor.

First, defendants point to *Sinclair Oil Corp. v. Levien*[56] for the proposition that "[a]s a general matter, entire fairness does not apply to a *pro rata* dividend paid to all stockholders."[57] In *Sinclair*, a parent corporation caused its 97%-owned subsidiary to pay large cash dividends on a *pro rata* basis to each of its stockholders. The Court determined that, because the cash was distributed on a *pro rata* basis, entire fairness did not apply "[s]ince the parent received nothing from the subsidiary to the exclusion of the minority stockholders of the subsidiary."[58] In reaching this conclusion, the Court cautioned that "[w]e do not accept the argument that the intrinsic fairness test can never be applied to a dividend declaration by a dominated board."[59] Here, unlike in *Sinclair*, the well-pled allegations of the Complaint show that NRG did receive something from Yield to the exclusion of the minority

---

[56] 280 A.2d 717, 720 (Del. 1971).

[57] Defs.' Opening Br. 27.

[58] *Sinclair*, 280 A.2d at 720.

[59] *Id*. at 271.

19

stockholders—the means to perpetuate its control position by financing future acquisitions with the low-vote Class C stock authorized in the Reclassification.

Second, defendants argue that "Delaware courts have applied entire fairness to nominally *pro rata* transactions in only a limited circumstance—where the controlling stockholder receives a unique benefit."[60] They point to examples such as where the sale of the corporation to a third-party terminated derivative claims the corporation had against the controller,[61] and where a controlling stockholder's immediate need for liquidity resulted in the sale of the corporation for a sub-optimal price.[62] Relying on our Supreme Court's decision in *Williams v. Geier*,[63] defendants argue that this line of precedent should not be extended to this case.

In *Williams*, a controlled corporation was recapitalized to:

> provide for a form of "tenure voting" whereby holders of common stock on the record date would receive ten votes per share. Upon sale or other transfer . . . each share would revert to one-vote-per-share status until that share is held by its owner for three years. The Reclassification applied to every stockholder, whether a stockholder was a minority stockholder or part of the majority bloc.[64]

---

[60] Defs.' Opening Br. 28.

[61] *Primedia*, 67 A.3d at 487.

[62] *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *9-11 (Del. Ch. Oct. 6, 2011).

[63] 671 A.2d 1368 (Del. 1996).

[64] *Id.* at 1370.

The plaintiff argued that entire fairness should apply because the reclassification impermissibly favored the majority bloc by entrenching its control.[65] On appeal from the Court of Chancery's grant of partial summary judgment in defendants' favor "[a]fter discovery was nearly complete,"[66] the Delaware Supreme Court applied business judgment review because it found plaintiff's claims to be "conclusory" and to "have *no factual support in this record*."[67] As the Court explained:

> There was *on this record*: (1) no non-pro rata or disproportionate benefit which accrued to the Family Group on the face of the Reclassification, although the dynamics of how the Plan would work in practice had the effect of strengthening the Family Group's control; (2) *no evidence adduced to show* that a majority of the Board was interested or acted for purposes of entrenching themselves in office; (3) no evidence offered to show that the Board was dominated or controlled by the Family Group; and (4) no violation of fiduciary duty by the Board.[68]

This case and *Williams* both involve a nominally *pro rata* distribution of new shares. But here, unlike in *Williams*, the case is at the pleadings stage and no discovery has been taken. This distinction is significant because the Supreme Court

---

[65] *Id*. at 1378. The Supreme Court assumed, without deciding, that a group consisting of members of a family and certain employee benefit plans that owned or controlled in excess of 50% of the corporation's voting power "represents a controlling bloc for purposes of this decision." *Id.* at 1371.

[66] *Id*. at 1375.

[67] *Id.* at 1378 (emphasis added).

[68] *Id*. (emphasis added).

in *Williams* did not stop its analysis once it found that the tenure voting recapitalization was *pro rata.* Instead, as the above quotation reflects, the Supreme Court specifically considered the board's motivations and other factors based on a developed factual record, including that there was "no evidence offered to show that the Board was dominated or controlled by the Family Group."[69] Notably, during a settlement hearing concerning Google's *pro rata* issuance of non-voting stock to perpetuate the founders' control of the company, then-Chancellor Strine commented that, if *Williams* applied, "a big part of what the trial [would be] about" would be whether the defendants "were well-motivated independent directors . . . who believed [the reclassification] was the right thing for [the company's] public stockholders."[70] Because the parties have not developed a factual record from which the motivations of defendants can be assessed, and because NRG's control over the Board is self-evident here, *Williams* is not dispositive and it would be premature for me to apply its reasoning at the pleadings stage.[71]

---

[69] *Id.* at 1378.

[70] *In re Google Inc. Class C S'holder Litig.*, C.A. No. 7469-CS, at 95-96 (Del. Ch. Oct. 28, 2013) (Strine, C.) (TRANSCRIPT).

[71] In a footnote, defendants argue that "[f]ollowing *Williams*, the Court of Chancery repeatedly has held that an equity offering that affects all stockholders equally does not give rise to a claim for breach of fiduciary duty." Defs.' Opening Br. 29 n.10 (citing *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *9-10 (Del. Ch. Jan. 14, 2010) and *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 135-37 (Del. Ch. 2003)). These cases are inapposite. In *Robotti*, the Court dismissed plaintiff's claims relating to a rights offering open to all stockholders, in part, "[b]ecause the Court cannot reasonably infer from the facts as alleged that the triggering of the anti-dilution provisions provided the Defendants

22

Third, defendants argue that NRG's extension of control was not a unique benefit because "[n]o reasonable stockholder could have expected control to shift to the minority through dilution caused by voluntary issuances."[72] According to defendants, Yield's public filings undermine such an expectation, the "yieldco" structure is premised on a parent-subsidiary relationship that benefits all stockholders, and NRG had no duty to allow its controlling position to be sacrificed through equity issuances.[73] This argument fails in my view.

Notwithstanding defendants' contentions, plaintiff has pled non-conclusory facts to support a reasonable inference that, whatever may have been the intentions behind Yield's original business model, NRG nevertheless was on the cusp of losing its control position in Yield when it undertook the Reclassification, which admittedly was done to perpetuate that control. Although "Delaware law does not . . . impose on controlling stockholders a duty to engage in self-sacrifice for the benefit of minority shareholders,"[74] a refusal to require that a controller be altruistic is not relevant to what standard of review should apply to a transaction in which the controller "extracts something uniquely valuable to the controller, even if the

---

a material benefit not shared by the remaining shareholders." 2010 WL 157474, at *6. *H-M Wexford* did not involve a controlling stockholder.

[72] Defs.' Opening Br. 32.

[73] *Id.* 32-34.

[74] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1040 (Del. Ch. 2012) (Strine, C.).

controller nominally receives the same consideration as all other stockholders."[75]

Here, that "something" was a means for NRG to ensure it would be able to retain voting control of Yield well into the future without abandoning a key aspect of its original business model, *i.e.*, using Yield equity to acquire income-producing assets. Thus, plaintiff has pled sufficient facts for purposes of this motion to warrant review of the Reclassification as a conflicted controller transaction that presumptively would be subject to entire fairness review.

### B.    The *MFW* Framework Applies to the Reclassification

Having decided that the Reclassification should be analyzed as a conflicted controller transaction, the next issue is whether the *MFW* framework should be applied to analyze plaintiff's challenge to the transaction. I conclude that it should for the reasons discussed below.

In *MFW*, our Supreme Court held that the business judgment rule is the appropriate standard of review for a challenge to a squeeze-out merger by a controlling stockholder if the transaction satisfies certain procedural protections:

> We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee

---

[75] *GAMCO Asset Mgmt. Inc. v. iHeartMedia Inc.*, 2016 WL 6892802, at \*16 (Del. Ch. Nov. 23, 2016) (citing *Crimson*, 2014 WL 5449419, at \*13).

that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders.[76]

The Supreme Court enumerated several reasons for its holding. One is that the "simultaneous deployment of [these] procedural protections . . . create[s] a countervailing, offsetting influence of equal—if not greater—force" than the undermining influence of a controller.[77] Another is that the dual protections of special committee review and the approval of a majority of the minority stockholders are "consistent with the central tradition of Delaware law, which defers to the informed decisions of impartial directors, especially when those decisions have been approved by the disinterested stockholders on full information and without coercion."[78] Although *MFW* itself was decided after discovery on a motion for summary judgment, its framework has been applied at the pleadings stage as well.[79]

Two years after the Supreme Court's *MFW* decision, Vice Chancellor Laster in *EZCORP* endorsed using the *MFW* framework outside of the context of a squeeze-out merger. As discussed above, he explained that the entire fairness standard presumptively governs "any transaction between a controller and the controlled

---

[76] 88 A.3d at 644.

[77] *Id.*

[78] *Id.* (quoting *In re MFW S'holders Litig.*, 67 A.3d 496, 528 (Del. Ch. 2013) (Strine, C.)).

[79] *See Books-A-Million*, 2016 WL 5874974, *aff'd*, 164 A.3d 56; *Swomley v. Schlecht*, C.A. No. 9355-VCL (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd*, 128 A.3d 992 (Del. 2015) (TABLE).

25

corporation in which the controller receives a non-ratable benefit."[80]   He further

reasoned that the *MFW* framework should apply to *all* transactions where the

controller receives a non-ratable benefit to potentially lower the standard of review:

> If a controller agrees up front, before any negotiations begin, that the controller will not proceed with the proposed transaction without both (i) the affirmative recommendation of a sufficiently authorized board committee composed of independent and disinterested directors and (ii) the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller, then the controller has sufficiently disabled itself such that it no longer stands on both sides of the transaction, thereby making the business judgment rule the operative standard of review.  [*MFW*], 88 A.3d at 644.  If a controller agrees to use only one of the protections, or does not agree to both protections up front, then the most that the controller can achieve is a shift in the burden of proof such that the plaintiff challenging the transaction must prove unfairness.[81]

The Court in *EZCORP* ultimately did not apply the *MFW* framework because the

advisory agreements at issue were not subject to a majority-of-the-minority vote.[82]

Nevertheless, the decision is a broad endorsement of the application of the *MFW*

framework to any form of conflicted controller transaction.

---

[80] *EZCORP*, 2016 WL 301245 at *11.

[81] *Id.* at *11; s*ee also id.* at *23 ("If a controller chooses the corporate form and issues equity, then the controller need not serve as a compensated executive or consultant.  Even at that point, the controller[] can obtain business judgment review by following [*MFW*], having a committee approve the compensation arrangement, and then submitting it to the disinterested stockholders for approval at the next annual meeting. Only if the controller makes choices in a way that invites entire fairness review will that framework come into play.").

[82] *Id.* at *30.

Earlier this year, in *In re Martha Stewart Living Omnimedia, Inc. Stockholder Litig.*,[83] Vice Chancellor Slights also endorsed the application of the *MFW* framework to a transaction other than a squeeze-out merger, which was the factual context before the Court in *MFW*. *Martha Stewart* involved a challenge to a controlling stockholder's alleged receipt of disparate consideration through "side deals" in a sale of the corporation to a third party.[84] The Court ultimately held that the business judgment rule was the appropriate standard of review because "the Complaint does not adequately plead that Stewart, as a controlling stockholder, engaged in a conflicted transaction."[85] In the course of its analysis, however, the Court opined that, had it found the transaction to be conflicted, the *MFW* framework would have applied because it could "see no principled basis to conclude that it would be somehow less important" that the controller and the third-party acquirer "be incentivized from the outset of their negotiations to take positions and to reach side deals that will be acceptable to the other stockholders than it would be if" the controller was negotiating to acquire the company herself:[86]

> In both instances, the key is to ensure that all involved in the transaction, on both sides, appreciate from the outset that the terms of the deal will be negotiated and approved by a special committee free of the controller's influence and that a majority of the minority

---

[83] 2017 WL 3568089.

[84] *Id.* at *2.

[85] *Id.*

[86] *Id.* at *18.

stockholders will have the final say on whether the deal will go forward. Regardless of which side of the transaction a conflicted controller stands, it is critical that the process is designed from the outset to incentivize the special committee and the controller to take positions at every turn of the negotiations . . . which will later score the approval of the majority of other stockholders. Only then is it appropriate to reward the controller with pleadings-stage business judgment rule deference.[87]

The broad application of the *MFW* framework to a range of transactions involving controllers would parallel the evolution of *MFW*'s doctrinal predecessor, *Kahn v. Lynch Commc'n Sys., Inc.*[88] In *Lynch*, our Supreme Court held, in the context of a parent-subsidiary merger, that "approval of the transaction by an independent committee of directors *or* an informed majority of minority shareholders shifts the burden of proof on the issue of fairness from the controlling or dominating shareholder to the challenging shareholder-plaintiff."[89] Two years later, in *Kahn v. Tremont Corp.*, Chancellor Allen applied the burden shift endorsed in *Lynch* to a transaction where a controller caused a subsidiary to purchase shares of a related entity from its parent company.[90] In doing so, the Chancellor explained

---

[87] *Id*. at *17.

[88] 638 A.2d 1110 (Del. 1994).

[89] *Id*. at 1117 (emphasis added).

[90] 1996 WL 145452, *rev'd on other grounds*, 694 A.2d 422. In its reversal opinion, the Supreme Court implicitly endorsed Chancellor Allen's burden shift holding, but reversed on factual grounds because it concluded "that the Special Committee did not operate in a manner which entitled the defendants to shift from themselves the burden which encumbers a controlled transaction." 694 A.2d at 430.

28

that "no plausible rationale for a distinction between mergers and other corporate transactions" had been offered and that he "in principle [could] perceive none."[91]

I find the reasoning of *EZCORP*, *Martha Stewart*, and *Tremont* persuasive and hold that the *MFW* framework should apply to the Reclassification, as I can see no principled basis on which to conclude that the dual protections in the *MFW* framework should apply to squeeze-out mergers but not to other forms of controller transactions. The animating principle of the *MFW* framework is that, if followed properly, the controlled company replicates an arm's-length bargaining process in negotiating and executing a transaction.[92] In my opinion, the use of these types of protections should be encouraged to protect the interests of minority stockholders in transactions involving controllers, whether it be a squeeze-out merger (*MFW*), a merger with a third party (*Martha Stewart*), or one in which the minority stockholders retain their interests in the corporation (*EZCORP*).

Plaintiff makes essentially two arguments why the *MFW* framework should not apply to the Reclassification, neither of which I find persuasive. First, plaintiff argues that the framework applies only to mergers because of "the Supreme Court's

_____

[91] 1996 WL 145452, at *7.

[92] *In re MFW*, 67 A.3d at 528 ("The 'both' structure . . . replicates the arm's-length merger steps of the DGCL by 'requir[ing] two independent approvals, which it is fair to say serve independent integrity-enforcing functions.'") (quoting *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 618 (Del. Ch. 2005) (Strine, V.C.)).

repeated emphasis that its holding applied in the context of mergers between a controlling stockholder and its subsidiary."[93] The repeated use of the word "merger" in the *MFW* opinion, however, simply reflects the factual scenario that was before the Court. The Supreme Court's decision never indicated that the rationale for its holding only applied to mergers and, to repeat, I see no principled reason why that rationale would not apply equally to other conflicted controller transactions. Put differently, the Supreme Court's silence as to other potential applications for the framework does not preclude an evolution of the doctrine.

Second, plaintiff argues that the *MFW* framework should not apply outside of the "controller merger scenario" because of other "protections" that may be present in that context but were not present in the Reclassification.[94] Plaintiff names three: (1) appraisal rights; (2) the provision of a fairness opinion; and (3) the loss of seats held by "directors of the controlled subsidiary."[95]

The lack-of-appraisal-rights argument is a *non sequitur* because the Reclassification was not a game-ending transaction. In defined circumstances, appraisal rights are available for minority stockholders who have lost their interest in a company as a result of a merger.[96] The principle behind appraisal is "that the

---

[93] Pl.'s Answering Br. 22.

[94] *Id.* 23.

[95] *Id.* 23-27.

[96] 8 *Del C.* § 262.

30

stockholder is entitled to be paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern."[97] Here, Yield's minority stockholders did not lose their proportionate interest in the Company and, unlike in a squeeze-out merger, they still have the choice whether to remain owners of Yield.

Plaintiff's assertion that *MFW* should not apply because Moelis did not provide a fairness opinion is equally unconvincing. As plaintiff concedes, fairness opinions are not required for any form of transaction, including mergers.[98] Indeed, the six-element framework laid out in *MFW* does not require the provision of a fairness opinion even for a squeeze-out merger.[99]

Plaintiff's last point—concerning the loss of director seats—is puzzling. Plaintiff contends that, "in the merger context, some (and often all) of the directors of the controlled subsidiary will lose their board seats," and those "who will lose their board seats are less susceptible . . . to future retribution by the controller."[100]

---

[97] *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950).

[98] Pl.'s Answering Br. 25; *see also Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 984 (Del. Ch. 2000) ("[F]airness opinions prepared by independent investment bankers are generally not essential, as a matter of law, to support an informed business judgment.").

[99] 88 A.3d at 645. As noted below, plaintiff makes a one-sentence argument in a footnote that the failure to obtain a fairness opinion here was a breach of the duty of care. This argument is wholly conclusory and does not come close to supporting a reasonably conceivable inference that the members of the Conflicts Committee were grossly negligent in failing to obtain one. *See infra.* n.102.

[100] Pl.'s Answering Br. 26.

31

This is not a legally-created protection and plaintiff offers no support for this contention. Attempting to predict whether a person will lose a director seat as a result of a transaction is purely conjectural. In any event, the issue is irrelevant here, where the independence of the members of the Conflicts Committee who negotiated and approved the Reclassification is unchallenged.

Because the *MFW* framework applies to the Reclassification, the operative question is whether the process implemented here satisfied that framework. I turn to that issue next.

## C. Application of the *MFW* Framework

The *MFW* Court laid out six elements that are required for the business judgment standard of review to apply to a conflicted transaction:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[101]

Plaintiff's only serious challenge to the application of the *MFW* framework concerns the fifth element.[102] According to plaintiff, the vote of the minority in

---

[101] 88 A.3d at 645.

[102] In a footnote, plaintiff devotes one sentence to assert that "the Committee's failure to demand a fairness opinion was, under the facts here, a breach of its duty of care in negotiating a fair price." Pl.'s Answering Br. 25 n.28 (internal quotation omitted). This assertion is wholly conclusory. "For purposes of applying the [*MFW*] framework on a

32

support of the Reclassification was not informed because there were disclosure deficiencies in the Proxy.[103]

"[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[104] A fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[105] Stated differently, material facts are those that, if disclosed, would "significantly alter[] the 'total mix' of information made available."[106]

"The application of [the materiality] standard does not require a blow-by-blow description of the proposed transaction. That is, the directors are 'not required to

---

motion to dismiss, the standard of review for measuring compliance with the duty of care is whether the complaint has alleged facts supporting a reasonably conceivable inference that the directors were grossly negligent." *Books-A-Million*, 2016 WL 5874974, at *17, *aff'd*, 164 A.3d 56. Fairness opinions are not essential to satisfy the duty of care, and plaintiff has failed to allege *any* facts supporting a reasonably conceivable inference that the members of the Conflicts Committee were grossly negligent in failing to obtain one here. *See Crescent/Mach I Partners*, 846 A.2d at 984 ("[F]airness opinions prepared by independent investment bankers are generally not essential, as a matter of law, to support an informed business judgment."). It also is far from clear what a fairness opinion would look like for this type of transaction.

[103] *See In re MFW*, 67 A.3d at 501 ("[I]f the majority-of-the-minority vote were tainted by a disclosure violation . . . the defendants' motion would fail" and entire fairness review would apply).

[104] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[105] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[106] *Arnold v. Soc'y for Savings Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).

33

disclose all available information,' but only that information necessary to make the disclosure of their recommendation materially accurate and complete."[107]  That said, "[w]hen fiduciaries undertake to describe events, they must do so in a balanced and accurate fashion, which does not create a materially misleading impression."[108]

Plaintiff's disclosure challenges fall into five categories: (1) potential alternatives to the Reclassification; (2) the additional assets that were added to the ROFO pipeline; (3) the value of the Reclassification to NRG; (4) the tenuous status of NRG's majority position in Yield before the Reclassification and the characterization of the Class C shares as a "sunset provision"; and (5) potential conflicts involving Moelis.  I address each category, in turn, below.

### 1. Potential Alternatives to the Reclassification

Plaintiff argues that the Proxy's failure to disclose certain alternatives to the Reclassification that NRG discussed with the Board constitutes a material omission.[109]  These alternatives were presented to the Board at an October 8, 2014 meeting, more than two months before the Board delegated to the Conflicts

---

[107] *Matador Capital Mgmt. Corp. v. BRC Hldgs, Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998) (internal citation omitted).

[108] *Clements v. Rogers*, 790 A.2d 1222, 1240 (Del. Ch. 2001) (Strine, V.C.).

[109] Pl.'s Answering Br. 27-28.

Committee the task of evaluating and making a recommendation whether to approve the Reclassification.[110]

Plaintiff's argument ignores the well-settled principle that "Delaware law does not require management to discuss the panoply of possible alternatives to the course of action it is proposing."[111] Directors are required to provide stockholders with "an accurate, full, and fair characterization of the events leading to a board's decision," but they do not have to provide a "play-by-play description of every consideration or action taken by a Board."[112] "[R]equiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless."[113] Relatedly, "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders."[114]

---

[110] Compl. ¶¶ 33, 37; McGillivray Aff. Ex. G NRGY-220_00000900.

[111] *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) (citation and quotation marks omitted).

[112] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511-12 (Del. Ch. 2010).

[113] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999) (emphasis in original).

[114] *Arnold*, 650 A.2d at 1280; *see also Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 145 (Del. 1997) ("Speculation is not an appropriate subject for a proxy disclosure."). Here, although the pleadings are not clear on the issue, the relevant slide in the board book is entitled "*Potential* Solutions to 50% Control Threshold," suggesting that the alternatives discussed may not have been fully-formed or actual possibilities. Compl. ¶ 52 (emphasis added).

Delaware courts repeatedly have held that management's failure to inform stockholders of other strategic alternatives it was considering at the time of the transaction in question is not a breach of fiduciary duty. For instance, in *3Com*, the plaintiff alleged that "the Proxy fails to disclose any details regarding [the target company's] stand-alone plan and other strategic initiatives considered by the Board as an alternative to the [cash-out] Merger."[115] In the context of deciding a motion to expedite discovery, Chancellor Chandler found that the claim failed to satisfy the low standard of colorability:

> This is not a disclosure violation. Delaware law does not require management "to discuss the panoply of possible alternatives to the course of action it is proposing…." This is consistent with the principle that too much information can be as misleading as too little. Moreover, under our law stockholders have a veto power over fundamental corporate changes (such as a merger) but entrust management with evaluating the alternatives and deciding which fundamental changes to propose.[116]

In response to this authority, plaintiff relies on three cases, each of which is factually distinguishable. In the first case, *Paramount Commc'ns Inc. v. QVC*

---

[115] 2009 WL 5173804, at *2.

[116] *Id.* at *6 (quoting *Seibert v. Harper & Row, Publishers, Inc.*, 1984 WL 21874, at *5 (Del. Ch. Dec. 5, 1984)); *see also Neustadt v. INX Inc.*, C.A. No. 7017-VCG, at 30-31 (Del. Ch. Dec. 16, 2011) (TRANSCRIPT) ("The plaintiff repeatedly alleges disclosure violations with respect to possible strategic alternatives, bid negotiations that fell through, and other transactions or opportunities that never were. It is settled, however, that the details of transactions that might have been are not material to the consideration of how to vote on the proposed transaction. Such details might be relevant to a claim that the directors were derelict in their *Revlon* duties or a similar allegation, but no colorable claim on those grounds have been alleged here.").

*Network Inc.*, the Delaware Supreme Court discussed what information would be relevant to directors in fulfilling their duty of care in selling control of a corporation.[117] The Court did not address the issue of disclosure to stockholders.

The second case, *In re Saba Software, Inc. Stockholder Litigation*, involved a highly unusual situation where the Securities and Exchange Commission deregistered shares of the corporation just before the stockholders were asked to approve a cash-out merger at a discount to the market price for the shares before the transaction was announced.[118] The Court expressly acknowledged that the rule in *3Com*, quoted above, "holds true in a typical case," before explaining that the "hardly typical" situation before it warranted the disclosure of "what alternatives to the Merger existed" in connection with the stockholders' consideration of whether the corporation "was viable as a going-concern without the Merger."[119]

Finally, plaintiff cites *Arnold v. Soc'y for Savings Bancorp, Inc.*[120] There, our Supreme Court held that the failure to disclose a bid for a particular asset was a

---

[117] 637 A.2d 34, 48 (Del. 1994) ("Under the facts of this case, the Paramount directors had the obligation . . . to obtain, and act with due care on, all material information reasonably available, including information necessary to compare the two offers to determine which of these transactions, or an alternative course of action, would provide the best value reasonably available to the stockholders.").

[118] 2017 WL 1201108, at *6, 13 (Del. Ch. Mar. 31, 2017) *as revised* (Apr. 11, 2017).

[119] *Id*. at *13.

[120] 650 A.2d 1270.

material omission.[121]  This holding, however, "turn[ed] on [a] *partial* disclosure issue."[122] "[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures."[123]  Therefore, "once defendants travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[124]  Here, plaintiff has not alleged that there was partial or incomplete disclosure of alternatives to the Reclassification but, rather, that "*none* of the alternatives to the Reclassification were disclosed to Yield's Class A stockholders."[125]  Thus, plaintiff's invocation of the partial disclosure doctrine is inapt.

In sum, Yield stockholders were asked to vote on the Reclassification.  They were not asked to weigh possible alternatives, which is the responsibility of the Board; they were not asked to approve a sale of control, which has unique implications under *Revlon* and its progeny;[126] and no allegation has been made that

---

[121] *Id*. at 1280-81.

[122] *Id*. at 1277 (emphasis added).

[123] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

[124] *Arnold*, 650 A.2d at 1280.

[125] Pl.'s Answering Br. 31 (emphasis added).

[126] For example, the existence of a viable higher bid is an alternative that would be material to a stockholder's decision to approve a sale of control of the company.  *See, e.g.*, *Jewel Cos., Inc. v. Pay Less Drug Stores Nw., Inc.*, 741 F.2d 1555, 1564 (9th Cir. 1984) ("Even after the merger agreement is signed a board may not, consistent with its fiduciary obligations to its shareholders, withhold information regarding a potentially more attractive competing offer."); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1295 (2d Cir. 1973)

they were provided partial, potentially misleading information about the alternatives. Under the circumstances here, where the Proxy fully disclosed the Conflict Committee's deliberations, including its negotiation of improvements to the Reclassification as originally proposed, the failure to disclose different potential strategic alternatives to the Reclassification that the stockholders were not asked to approve does not state a disclosure claim under well-established precedent.

### 2. Additions to the ROFO Pipeline

Plaintiff argues that the Board had a duty to disclose: (1) the generation capacity of the new assets available under the Amended ROFO Agreement; and (2) their potential impact on cash available for distribution ("CAFD"), as estimated by Moelis. With respect to the generation capacity, the issue is academic because the Proxy in fact disclosed the generation capacity for each of the additional assets that was made available under the Amended ROFO Agreement.[127]

With respect to the CAFD estimates, plaintiff's challenge is ironic given its position that "it may not have mattered that these assets were in the pipeline" since including them "does not dictate whether they will find their way to Yield" and, as

---

("[W]hen endorsing one offer [management] must inform stockholders of any better ones.").

[127] McGillivray Aff. Ex. A at 27.

"the proxy supports," there "have, in fact been situations where assets flowed from NRG to Yield from outside the pipeline."[128]

More importantly, the potential impact of the new ROFO assets on CAFD was not material information because such an estimate would be speculative.[129] As plaintiff recognizes, the Amended ROFO Agreement only listed assets that NRG *may* offer to Yield at some point in the future. Because of the uncertainty surrounding which, if any, of these assets would be offered to Yield and when those assets may be made available, the estimated impact on CAFD would be too conjectural to significantly alter the total mix of information available.

Plaintiff cannot salvage its disclosure claim by arguing that the impact of the additional assets on CAFD is material because Chlebowski asked about it in an email to Moelis. This contention fails because whether a director analyzes a particular piece of information for purposes of fulfilling his fiduciary obligations is a very different matter than the standard for materiality applicable to a stockholder vote.

---

[128] Tr. 114 (June 20, 2017) (Dkt. 31).

[129] *See Loudon*, 700 A.2d at 145 ("Such a disclosure requirement would oblige the Committee to speculate about its future plans. Speculation is not an appropriate subject for proxy disclosure."); *Arnold*, 650 A.2d at 1280 ("Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders.").

As this Court has stated, "not every document reviewed by the board is material" to a stockholder vote.[130]

### 3. Value of the Reclassification to NRG

Plaintiff contends that the Board had a duty to disclose "Moelis's failure to perform any analysis concerning the potential value transfer to NRG as a result of the Recapitalization."[131]  Although an analysis of the potential value transfer to NRG as a result of the Reclassification (*i.e.*, the value of perpetuating control) certainly could be material, negative disclosure is not required under Delaware law.

In *In re JCC Holding Co., Inc.*, plaintiffs argued that there was a disclosure violation because the proxy statement did not disclose that the investment banker was not required to perform a DCF valuation in connection with a transaction.[132]  The Court easily disposed of this argument:

> Put bluntly, this speculative argument does not set forth a viable disclosure claim. . . . Under Delaware law, there is no obligation on the part of a board to disclose information that simply does not exist—in

---

[130] *Wayne Cty. Emps. Ret. Sys. v. Corti*, 954 A.2d 319, 332 (Del. Ch. 2008). *See id.* ("'[T]he fact that something is included in materials that are presented to a board of directors does not, *ipso facto*, make that something material.  Otherwise every book that's given to the board and every presentation made to the board would have to be part of the proxy material that follows the board's approval of a transaction.  That certainly is not the law.'") (quoting *In re BEA Sys., Inc. S'holder Litig.*, C.A. No. 3298-VCL, at 100 (Del. Ch. Mar. 26, 2008) (TRANSCRIPT)).

[131] Pl.'s Answering Br. 33.

[132] 843 A.2d 713, 720 (Del. Ch. 2003) (Strine, V.C.).

this case, a non-existent DCF valuation and other non-existent information that plaintiffs identify in the complaint.[133]

Although plaintiff acknowledges "that Moelis and the committee did not, in fact, analyze the give from Yield in this transaction,"[134] plaintiff nevertheless tries to save its disclosure claim by arguing that "the Proxy contained misleading, partial disclosures that would have misled reasonable stockholders into believing that Moelis analyzed the relative 'give' and 'get' of the Reclassification."[135] Specifically, plaintiff points to the following two passages in the Proxy:

- "[T]he Conflicts Committee and its advisors . . . reviewed a presentation by Moelis discussing the potential financial impact of the February 17 Revised Proposal as well as comparing the revised proposal to reclassifications undertaken by other companies with dual-class capital structures."

- "[T]he Conflicts Committee informed NRG that, after review and analysis of the February 17 Revised Proposal with assistance of Moelis and [Crowell & Moring], the Conflicts Committee determined that such proposal was acceptable to the Conflicts Committee and unanimously approved the February 17 Revised Proposal."[136]

---

[133] *Id.* at 720-21; *see also In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1132 (Del. Ch. 2011) ("If a disclosure document does not say that the board or its advisors did something, then the reader can infer that it did not happen."); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 204 (Del. Ch. 2007) (Strine, V.C.) ("[T]his court has noted that so long as what the investment banker did is fairly disclosed, there is no obligation to disclose what the investment banker did not do."); *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1186-87 (Del. Ch. 2007) (holding that defendants were not required to make a "negative disclosure").

[134] Tr. 119 (June 20, 2017) (Dkt. 31).

[135] Pl.'s Answering Br. 34.

[136] *Id.* 34-35 (citing McGillivray Aff. Ex. A at 24).

I do not see where the passages quoted above suggest that Moelis analyzed the value NRG would receive from the Reclassification. If anything, these passages indicate simply that the Board and its advisors discussed the impact of the Reclassification on *Yield*. Accordingly, there was no partial disclosure violation concerning a non-existent analysis by Moelis of the value that may have been transferred to NRG.[137]

### 4. Disclosures Concerning NRG's Majority Position in Yield and the Class C Stock as a "Sunset Provision"

Plaintiff asserts that the Proxy materially misled stockholders regarding the probable timeframes by which NRG would lose its majority voting position in Yield both before and after the Reclassification. I address each issue in turn.

### a. NRG's Majority Position Before the Reclassification

Plaintiff asserts the Proxy failed to disclose that "in the absence of the Recapitalization, NRG's ownership *could have been* reduced below 50.1% as early as 2015 without additional Yield equity issued to NRG . . . and that to maintain voting control (at least 50.1% ownership) in Yield, NRG would have had to take

---

[137] Plaintiff cites *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009) in support of its claim that Moelis's failure to analyze the value transferred to NRG is material information that should have been disclosed to stockholders. *Gantler* is distinguishable because the Court found that there was an *affirmative* misrepresentation in the proxy statement. *See id.* at 710-11 ("a board cannot properly claim in a proxy statement that it had carefully deliberated and decided that its preferred transaction better served the corporation than the alternative, if in fact the Board rejected the alternative transaction without serious consideration."). Here, plaintiff has not pointed to any affirmative misrepresentation in the Proxy regarding a non-existent analysis of the value transfer to NRG.

43

back ~$118mm in Yield stock for scheduled dropdowns through 2019."[138]

Plaintiff's claim fails because this scenario is a hypothetical that is inherently speculative and thus not required to be disclosed under Delaware law.[139]

The speculative nature of the scenario is demonstrated by disclosures in the Proxy explaining that the Company had been employing methods to manage voting dilution: "We currently have several ways to manage voting dilution to the extent that the Board deems it appropriate, including using cash to finance acquisitions, repurchasing shares of Class A common stock in the market and granting cash-

---

[138] Pl.'s Answering Br. 36 (emphasis added) (quotation marks and alternations omitted). Plaintiff's suggestion that the Proxy misled anyone about the prospect that NRG could lose its majority position in the near future also is at odds with its contention that "this should not have come as too much of a surprise" to stockholders reading the Proxy. Tr. 75 (June 20, 2017) (Dkt. 31).

[139] *See, e.g.*, *In re Family Dollar Stores, Inc. Stockholder Litig.*, 2014 WL 7246436, at *21 (Del. Ch. Dec. 19, 2014) (citation and quotation marks omitted) ("Because the magnitude of potential synergies is dependent, at least in part, on the magnitude of divestitures, and because the required divestitures are not currently known, any statement in the Proxy about potential synergies would amount to speculation, which is not an appropriate subject for a proxy disclosure."); *Cty. of York Emps. Ret. Plan v. Merrill Lynch & Co., Inc.*, 2008 WL 4824053, at *13 (Del. Ch. Oct. 28, 2008) ("That the proxy does not discuss the Plaintiff's hypothetical scenarios regarding what impact the negotiations concerning the Chairman's employment and compensation might have had on the merger negotiations is of no moment."); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *12 (Del. Ch. Jan. 25, 1999) (Strine, V.C.) (holding that "[t]he disclosure of a hypothetical—and therefore inherently tentative—concluded market value" of shares was not required because, *inter alia*, "[t]he risk that an unreliable analysis could lead stockholders to reject a good deal based on the false hope that a better deal was around the corner is one a board must consider in assessing whether to disclose. Further disclosure therefore may have made the Proxy Statement less, not more, reliable." (citing *Arnold*, 650 A.2d at 1283; *In re Vitalink*, 1991 WL 238816, at *13 (Del. Ch. Nov. 8, 1991))).

settled equity incentives."[140] Thus, in addition to the fact that there is an inherent level of uncertainty in predicting which transactions might close in the future and when they might close, Yield had been employing options to manage voting dilution that call into question how those transactions might be structured and make it anyone's guess whether the hypothetical plaintiff identifies would have come to pass.

Furthermore, the Proxy did disclose the certain, known information concerning the status of NRG's ownership in Yield that existed as of the record date for the stockholder vote on the Reclassification (March 16, 2015), including that "NRG beneficially owned 42,738,750 shares of Class B common stock, representing 55.3% of [Yield's] total outstanding voting power," and that absent the Reclassification, "NRG would hold less than a majority of [Yield's] outstanding voting power after issuing approximately eight million additional shares of Class A common stock."[141] Thus, the Proxy did indicate how close NRG was to losing majority control, and stated the specific amount of additional equity issuances that would cause NRG to lose control. A hypothetical timeline of when NRG might lose control would not have significantly altered the "total mix" of information already available to stockholders and thus is immaterial.

---

[140] McGillivray Aff. Ex. A at 25.

[141] *Id.* at 28.

### b. Class C Stock as a "Sunset Provision"

Plaintiff argues that the Proxy's characterization of the Class C stock as a "sunset provision" on NRG's control is materially misleading. The relevant sentence appears in the section of the Proxy describing the background of the transaction that compares the differences between the proposal NRG made on February 6, 2017, with the one it made on February 17. It states as follows:

> On February 17, 2015, the Conflicts Committee received an updated proposal from NRG in response to the Conflicts Committee's proposed amendments to NRG's February 6 Proposal. . . . Under the February 17 Revised Proposal, in response to the Conflict Committee's suggested amendments, NRG agreed to expand the current pipeline of assets available for purchase by us from NRG under the Original ROFO Agreement . . . In addition to the enhanced ROFO arrangement, the February 17 Revised Proposal provided that the proposed new class of stock be issued to the holders of Class A shares in the recapitalization would entitle to holders of such shares to 1/100 of a vote per share, rather than no votes as contemplated in the February 6 Proposal, *which would effectively function as a sunset provision* as NRG would lose majority voting control when its economic interest was diluted to approximately 8.7%.[142]

On one hand, read in isolation, the above reference to a "sunset provision" could be understood to imply that NRG's control might end at some reasonably foreseeable point in time if the Reclassification is approved. The reality, however, is that Yield would have to issue 823.4 million new shares of Class C stock, more

---

[142] *Id.* at 23-24 (emphasis added).

than ten times the number of shares outstanding before the Reclassification, for NRG's economic interest to be diluted enough (by 8.7%) for it to lose control.[143]

On the other hand, the Proxy does not define the term "sunset provision," and the disclosure appears in the context of explaining the difference between NRG's original proposal to issue non-voting shares—which presumably would have ensured NRG permanent voting control—and its revised proposal to issue shares with 1/100 of a vote per share, which indeed could lead to an eventual loss of control for NRG, *i.e.*, "effectively function as a sunset provision." Although the eventual loss of voting control would occur only after a very large amount of equity issuances, that fact should have been intuitively obvious given that the new Class C shares would have *only 1/100 of a vote per share*.

In any event, whether the "sunset" characterization *read in isolation* may have been misleading is not dispositive. When determining whether there has been a disclosure violation, a proxy statement should be read as a whole.[144] When the Proxy is read in full, I do not believe the "sunset" characterization was materially misleading because the Proxy makes clear that the Conflicts Committee and the Board believed it was important to Yield's success that NRG continue to be Yield's

---

[143] Compl. ¶ 60.

[144] *See In re MONY Grp. Inc. S'holder Litig.*, 852 A.2d 9, 31 (Del. Ch. 2004), *as revised* (Apr. 14, 2004) (emphasizing that the proxy statement should be "[r]ead fully" and "read in full").

controlling stockholder and that NRG would not be in danger of losing control any time soon after the Reclassification. For example:

- "In the view of the Conflicts Committee . . . NRG's influence—in part through voting control—has been an important element of our success."[145]

- "We believe our relationship with NRG, including **NRG's expressed intention to maintain a controlling interest in the Company**, provides significant benefits, including management and operational expertise, and future growth opportunities."[146]

- "***The Recapitalization Could Prolong the Period of Time During Which NRG Can Exercise a Controlling Influence on Most Corporate Matters***."[147]

- "NRG currently has, and following the Recapitalization will continue to have, the voting power required to decide the outcome of most matters submitted for a vote of our stockholders."[148]

In addition, the Proxy provided sufficient information that would allow a stockholder to calculate when the "sun would set." The Proxy explains "NRG will . . . lose voting power when it sells or transfers shares of Class B common stock or Class D common stock or when [Yield] issue[s] additional shares of Class A or Class C common stock in an amount sufficient to reduce NRG's voting ownership to a minority stake."[149] The Proxy also includes the number of Class A and Class B

---

[145] McGillivray Aff. Ex. A at 25.

[146] *Id.* at 26 (emphasis added).

[147] *Id.* at 28 (emphasis in original).

[148] *Id.* at 28-29.

[149] *Id.* at 28.

shares outstanding as of the record date, how the Class C and Class D shares would be distributed in the Reclassification, and the relative voting power of each class of shares.[150] Therefore, the Proxy provides all the inputs necessary for one to determine, after the Reclassification, how many Class C shares Yield would have to issue for NRG to lose control, *i.e.*, when its economic interest in Yield fell below 8.7%.[151] Indeed, the disclosure of these inputs presumably was the basis for plaintiff's allegation that Yield would have to issue 823.4 million new Class C shares for this to occur.[152]

### 5. Moelis's Potential Conflicts and Compensation

Plaintiff argues that "the Proxy failed to disclose material information about Moelis's incentives and conflicts, including [1] any of Moelis's past investment banking or capital markets services provided to NRG, Yield or the Conflicts

---

[150] *Id.* at 2, 20, 21.

[151] *See, e.g.*, *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 905 (Del. Ch. 2016) (finding supplemental disclosures regarding individual company EBITDA and revenue multiples not to be material, in part, because the information was publicly available); *MONY*, 853 A.2d at 683 (citation and internal quotation marks omitted) ("Proxy statements need not disclose facts known or reasonably available to the stockholders.").

Relying on *Doppelt v. Windstream Holdings, Inc.*, 2016 WL 612929, at *5 (Del. Ch. Feb. 5, 2016), plaintiff argues that having stockholders go through this mathematical exercise does not cure the Proxy's failure to disclose the number of Class C shares that Yield would have to issue for NRG to lose control. In *Doppelt*, however, the stockholder had to go outside the proxy statement and look to press releases, investor presentations, and information statements to gather the information in question. *Id.* Here, all of the inputs necessary to compute how many Class C shares would need to be issued to dilute NRG's economic interest below 8.7% is contained in the Proxy itself.

[152] Compl. ¶ 60.

Committee or [2] any details about the size or nature of Moelis's fee for advising the Conflicts Committee in connection with the Reclassification."[153]

As to the first issue, plaintiff's claim is wholly conclusory. In *Loudon*, the Delaware Supreme Court reiterated the well-settled principle that "it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleadings not be merely conclusory."[154] In that case, plaintiff alleged that the "Proxy Statement failed to disclose all of the material facts concerning the Board's conflicts of interest and lack of independence."[155] Reasoning that "some factual basis must be provided from which the Court can infer materiality of an identified omitted fact," which "is inherently a requirement for a disclosure claim," the Court agreed with the trial court that "this conclusory allegation had failed to state a cognizable claim."[156]

Here, despite seeking books and records from Yield through a Section 220 demand, plaintiff fails to plead any facts to substantiate that Moelis provided any advisory services to NRG, Yield, or the Conflicts Committee in the past, much less any that could be said to have created a conflict of interest with respect to the advice it provided the Conflicts Committee concerning the Reclassification. Accordingly,

---

[153] Pl.'s Answering Br. 38.

[154] 700 A.2d at 140.

[155] *Id*. at 145.

[156] *Id*. at 145-46. *See also York Emps. Ret. Plan*, 2008 WL 4824053, at *11 (finding allegation that proxy did not "adequately disclose the inherent conflicts that [the financial advisor] faced" was "conclusory" and "not colorable").

plaintiff's disclosure claim with regard to Moelis's potentially undisclosed past advisory services is conclusory and fails to state a claim for relief.

As to the second issue, the failure to disclose the size and nature of Moelis's fee does not constitute a disclosure violation under the specific circumstances of this case. Best practice certainly would be to disclose the size and nature of a financial advisor's compensation.[157] Best practice, however, does not necessarily equate to materiality. Plaintiff points to a number of decisions where Delaware courts have found the fees paid to financial advisors to be material to stockholders.[158] In each of those cases, however, the specific compensation in question was at least partially

---

[157] *See* Leo E. Strine, Jr, *Documenting the Deal: How Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone*, 70 BUS. LAW. 679, 692-93 (2015) (noting that, in a challenged transaction, the plaintiffs' bar "will pose probing questions," including those about the nature and size of the financial advisor's compensation, and "[h]ow well you are able to answer these questions can be the difference between getting a case resolved early and having it haunt you for a long time").

[158] *See, e.g.*, *Frank v. Elgamal*, 2014 WL 957550, at *33 (Del. Ch. Mar. 10, 2014) (citations omitted) ("The compensation and potential conflicts of a financial advisor are most likely material information that the board should generally disclose."); *In re Atheros Commc'ns, Inc. S'holder Litig.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) ("Not disclosed in the Proxy Statement is the amount of compensation that Qatalyst will receive. Perhaps more importantly, also not disclosed in the Proxy Statement is a quantification of the amount of the fee that is contingent."); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011) (citations omitted) ("Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, this Court has required full disclosure of investment banker compensation and potential conflicts."); *Hammons*, 2009 WL 3165613, at *17 ("[T]he compensation and potential conflicts of interest of the special committee's advisors are important facts that generally must be disclosed to stockholders before a vote.").

contingent in nature.[159]  Contingent fee arrangements obviously can be problematic

because they may incentivize advisors to prioritize the closing of the transaction over

getting the best deal possible for stockholders.[160]

But this concern is not present here.  It is beyond dispute that Moelis's

compensation was non-contingent.[161]  The Conflicts Committee hired Moelis to be

its "financial and capital markets advisor."[162]  Thus, whatever amount the Conflicts

Committee decided to pay its outside adviser on a non-contingent basis falls squarely

---

[159] *See Frank*, 2014 WL 957550, at *34 (noting a $350,000 contingency fee); *Atheros*, 2011 WL 864928, at *8 ("The 'portion' of the fee that will be paid regardless of whether the Transaction closes is roughly only two percent.  Thus, the compensation that Qatalyst will receive if the Transaction closes is nearly fifty times the fee that it would receive if there is no closing."); *Del Monte*, 25 A.3d at 835 (explaining the conflict of interest where an investment bank served as both a sell-side advisor and a buy-side lender, since "[i]f another bidder declined or did not need Barclays's financing, the bank would lose half of the approximately $44.5 to $47.5 million that Barclays stands to earn from its dual role"); *Hammons*, 2009 WL 3165613, at *16 (pointing out that the firm that was alleged to have "played a substantial role in negotiations between" the two parties to a merger also provided the acquirer financing to complete the transaction).

[160] *See Atheros*, 2011 WL 864928, at *8 (citations omitted) ("Contingent fees are undoubtedly routine; they reduce the target's expense if a deal is not completed; perhaps, they properly incentivize the financial advisor to focus on the appropriate outcome.  Here, however, the differential between compensation scenarios may fairly raise questions about the financial advisor's objectivity and self-interest.  Stockholders should know that their financial advisor, upon whom they are being asked to rely, stands to reap a large reward only if the transaction closes and, as a practical matter, only if the financial advisor renders a fairness opinion in favor of the transaction.").

[161] Although plaintiff did not avail itself of the opportunity to determine if Moelis's compensation was paid on a non-contingent basis before filing its complaint by, for example, requesting a copy of Moelis's engagement letter in connection with its Section 220 demand, defendants represented (and plaintiff does not contest) that Moelis was paid on a non-contingent basis.  Tr. 69 (June 20, 2017) (Dkt. 31).

[162] McGillivray Aff. Ex. A at 23.

within the Conflicts Committee's business judgment. In short, the failure to disclose the specifics of Moelis's compensation does not constitute a material omission under the circumstances of this case because there was no potential for a conflict of interest, and directors do not have an obligation to disclose information about the *non-existence* of misaligned incentives.[163]

* * * * *

In sum, for the reasons stated above, plaintiff has failed to plead facts sufficient to call into question satisfaction of any of the six elements set forth in the *MFW* framework. Thus, the Reclassification is subject to the business judgment rule, which plaintiff has made no effort to overcome. Accordingly, both of plaintiff's fiduciary duty claims fail to state a claim for relief.[164]

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Complaint with prejudice is GRANTED.

**IT IS SO ORDERED.**

---

[163] *See JCC Holding*, 843 A.2d at 721 ("Under Delaware law, there is no obligation on the part of a board to disclose information that simply does not exist.").

[164] Even if I had concluded that the stockholder vote was not informed so that entire fairness would apply, the claim against the three members of the Conflicts Committee would be subject to dismissal due to the presence of a Section 102(b)(7) provision in Yield's certificate of incorporation (McGillivray Aff. Ex. W Art. Nine) and the absence of any allegations against them amounting to bad faith or disloyalty. *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1187 (Del. 2015) (Strine, C.J.).